Hillsborough
No. 85-229

THE STATE OF NEW HAMPSHIRE

v.

JOSEPH DELLORFANO

October 3, 1986

*Stephen E. Merrill*, attorney general (*Tina Schneider*, assistant attorney general, on the brief and orally), for the State.

*Joanne Green*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

KING, C.J.  The defendant was tried by a jury and convicted on charges of accomplice to armed robbery, RSA 636:1, III(a) and RSA 626:8, III; accomplice to kidnapping, RSA 633:1 and RSA 626:8, III; and possession of a controlled drug, second offense, RSA 318-B:26, I(b)(2). During trial, the Court (*Bean*, J.) overruled the defendant's objection to the admission of certain statements made to the police before and after *Miranda* warnings. This ruling, and the court's failure to give a particular accomplice testimony instruction, are challenged on appeal. For the reasons that follow, we affirm.

Shortly after midnight on May 8, 1984, Marc Dahlstrom locked up the Merit gas station on Elm Street in Manchester. A man followed Dahlstrom home and, upon reaching Dahlstrom's apartment, ordered him at gunpoint to return to the station. They were joined enroute by the defendant, who the first man referred to as "Jake." Dahlstrom later described Jake as being about 5 feet, 7 inches in height and weighing 150 pounds, having a dark complexion, collar-length wavy hair, and a moustache, and possibly being of Greek extraction. He wore dark pants and a black jacket.

At the gas station, the first man took $300, including $201 in singles, from a drawer and unsuccessfully attempted to shoot open two safes. He left with the money and Dahlstrom contacted the police, who responded at 12:24 a.m. From the site where the first man and the defendant were last seen, a tracking dog followed a scent to Orange Street. In addition, other police officers were ordered to stake out the vicinity of Orange Street. Robert Haas, who lived in an apartment at 137 Orange Street, was a suspect in similar armed robberies. As a woman approached the apartment, she was questioned by the police. She identified herself as Holly Baker and indicated that she was going to visit Haas. She volunteered a plastic bag containing marijuana and was arrested and taken to the police station.

Baker admitted to being an accomplice in the Merit gas station robbery, along with Haas and a Puerto Rican man she knew as "Jay," and gave a description of Jay similar to Dahlstrom's description of "Jake." She stated that at about 11:00 p.m. that night, she and Haas drove to the Kimball Street Project and picked up Jay. Haas dropped off Jay and Baker at a motel across from the Merit station, drove home, and returned by foot. Baker remained at the motel to divert the night clerk's attention while the two men robbed the station.

Based on this information, the police obtained a search warrant for Haas's apartment and car. Before the warrant was executed, however, the police arrested the defendant and Haas as they were leaving the apartment building parking lot. A search of the defendant uncovered a roll of money, including $152 in one-dollar bills, and a bag of marijuana. A search of the car revealed two firearms. The defendant was taken to the Manchester police station, booked, and placed in a jail cell.

That morning, police officer Timothy Dobmeier interrogated the defendant. Officer Dobmeier testified to the following chain of events:

> "Before I went down to the cell block to retrieve Mr. Dellorfano for an interview I read what notes had been prepared, and it was noted in the prepared notes that the victim from the Merit Gas Station had informed the investigators that one of the assailants were [sic] referred to by the other as Jake. And in reviewing Holly Baker's statement to Detective Moore she also stated that her and Robert Haas had gone to the Kimball Street Project and picked up a guy by the name of Jay. So, with that in mind I went down to the cell block and upon entering the cell block I simply stated, 'Hey, Jay.'"

The defendant responded "Yeah." Officer Dobmeier walked over to the cell and said "Jay?" The defendant said "Yeah" and was taken upstairs to an interview room. He was given *Miranda* warnings and stated that he did not want a lawyer at that time. He told Officer Dobmeier that he was staying at Haas's apartment and had been there for the entire evening. The defendant denied any involvement in the Merit gas station robbery until, according to Officer Dobmeier,

> "I confronted [him] with the physical description provided by the victim at the Merit Gas Station; fitting him very closely . . . and I also confronted him with the fact that I

had just simply walked into the cell block and asked for Jay and that he had answered, and that the victim from the gas station had referred to—had stated that one of his assailants had referred to the other as Jake."

The defendant then indicated that he knew what Robert Haas had been up to and offered to give the police information on three or four other robberies "on a silver platter for a deal." At trial, the defendant was convicted of accomplice to armed robbery, accomplice to kidnapping, and possession of a controlled drug, second offense. This appeal then ensued.

The defendant's contentions on appeal are as follows. First, the defendant's response to Officer Dobmeier's inquiry of "Hey, Jay," was inadmissible at trial because the officer's statement amounted to custodial interrogation before administration of the defendant's *Miranda* rights. Second, the elicitation of the defendant's unwarned statement tainted his latter, warned statement offering to provide information on other robberies in exchange for a deal. As a result, the latter statement was also inadmissible at trial. Third, the trial judge erred in not giving the defendant's requested instructions on accomplice testimony to the jury.

Before addressing the substance of the defendant's arguments, we must establish the specific framework of analysis. The defendant's brief cites New Hampshire case law, apparently in an effort to implicate the protections of the New Hampshire Constitution. This court has stated that it "has the power to interpret the New Hampshire Constitution as more protective of individual rights than the parallel provisions of the United States Constitution." *State v. Ball*, 124 N.H. 226, 231–32, 471 A.2d 347, 350 (1983). When a defendant specifically invokes the State Constitution, we will consider those constitutional claims before addressing federal claims. *Id.* at 232, 471 A.2d at 351. However, the defendant must fulfill two preconditions before triggering a State constitutional analysis: first, the defendant must raise the State constitutional issue below, *State v. Westover*, 127 N.H. 130, 497 A.2d 1218 (1985) (defendant's brief referred in terms to the State Constitution, but since the defendant failed to rely on the applicable State constitutional provision in his pre-trial motion to suppress, the issue had not been preserved for appeal); second, the defendant's brief must specifically invoke a provision of the State Constitution, *State v. Reynolds*, 124 N.H. 428, 432, 471 A.2d 1172, 1173–74 (1984) (although defendant's brief referred extensively to State case law, the defendant did not cite a New Hampshire constitutional provision and thus did not raise a State constitutional issue).

In the instant case, the defendant did not unambiguously and specifically raise self-incrimination issues grounded in the New Hampshire Constitution (part I, article 15). In *State v. Cimino*, 126 N.H. 570, 572, 493 A.2d 1197, 1199–1200 (1985), we cautioned defendants to raise a clear State, as distinct from federal, constitutional claim at the trial court level in order to invoke *State v. Ball* at the appellate level. At the trial of this case, the defendant objected to the admission of his statements to police based only on generalized "constitutional" concerns. Nowhere does the trial record indicate a State constitutional foundation for the defendant's objection. His pre-trial motion to suppress does mention the New Hampshire Constitution, but the motion posits an illegal search and seizure. The motion does not call for suppression of evidence based on a theory of compelled self-incrimination. Search and seizure issues are not coextensive with self-incrimination issues. *See generally*, 1 D. NEDRUD, THE SUPREME COURT AND THE CRIMINAL LAW, A § 2–§ 4 (search and seizure), B § 1 (interrogation), B § 3 (self-incrimination/identification) (8th ed. 1985). At the federal level, the fifth amendment is not subsumed within the fourth amendment. At the State level, part I, article 15 is not subsumed within part I, article 19.

Because the defendant failed to raise a specific article 19 issue below, we elect to follow *Reynolds* and enforce the admonition of *Cimino*. We will thus not perform a State constitutional analysis of defendant's compelled self-incrimination arguments.

The defendant's federal constitutional arguments proceed in close, sequential fashion. First, defendant's response to "Hey, Jay," was the product of a custodial interrogation before the advisement of the defendant's *Miranda* rights. Consequently, the trial judge should have excluded evidence of defendant's response. Second, the defendant's subsequent post-*Miranda* warning statement (offering information about other robberies "on a silver platter for a deal") was tainted by the previous *Miranda* violation.

■ *Miranda v. Arizona*, 384 U.S. 436 (1966), clearly states that the fifth amendment requires the exclusion of incriminating statements elicited during a custodial interrogation prior to apprising the suspect of his constitutional rights. In its brief the State argues that Officer Dobmeier's exclamation "Hey, Jay," did not constitute interrogation and thus fell outside the proscriptive ambit of *Miranda*.

■■ The United States Supreme Court elaborated on the definitional parameters of interrogation in *Rhode Island v. Innis*, 446 U.S. 291 (1980). The *Innis* court interpreted the term "interroga-

tion" broadly, encompassing not just straightforward questions but also "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. The record shows that Officer Dobmeier had read Holly Baker's affidavit in which she referred to one of the perpetrators as "Jay." Officer Dobmeier acknowledged that he went down to the jail cell area with the perpetrator's nick-name "in mind." He then called out the nick-name. It is obvious that Officer Dobmeier did so in order to prompt an incriminating answer. Employing the terminology of *Innis*, however, Dobmeier at the very least should have known that he was reasonably likely to draw an incriminating response. Consequently, the defendant's answer occurred during a functional interrogation before advisement of *Miranda* rights. The trial court erred in not excluding the defendant's response. We must then consider whether the trial judge committed harmless error. However, we shall reserve our harmless error analysis until we have decided whether the defendant's unwarned response so tainted his subsequent warned statement that the latter statement also required exclusion at trial.

█ As we have already noted, *Miranda* requires the exclusion of unwarned incriminating admissions obtained by custodial police interrogation. Unfortunately, the *Miranda* decision left ambiguous the issue of whether the fifth amendment similarly requires the exclusion of evidence derived from *Miranda* violations. This ambiguity was compounded by the Supreme Court's pre-*Miranda* enunciation of the "fruit of the poisonous tree doctrine" in the field of fourth amendment law. Briefly stated, the "fruit of the poisonous tree" doctrine mandates suppression of evidence seized during an illegal search. *Wong Sun v. United States*, 371 U.S. 471 (1963). For nearly twenty years an open question existed as to whether *Wong Sun* extended to admissions obtained in contravention of *Miranda*. If so, non-compliance with *Miranda* procedures would necessitate the exclusion of the violation's derivative evidence. It was not until *Oregon v. Elstad*, 105 S. Ct. 1285 (1985), that the Supreme Court confronted the applicability of the *Wong Sun* doctrine to *Miranda* violations. *Elstad* settled the issue by holding that an uncoerced incriminating admission elicited in violation of *Miranda* would not taint a later uncoerced admission made after the advisement and waiver of a defendant's *Miranda* rights.

The facts of *Elstad* involved police questioning of one Michael Elstad at his home pursuant to a burglary investigation. The interrogation occurred before apprisement of Elstad's *Miranda* rights.

During the discussion a police officer told Elstad that the officer "felt he [Elstad] was involved." *Id.* at 1289. At that point Elstad admitted that he had been present at the burglary scene. The law enforcement authorities consequently transported Elstad to the sheriff's office and only then administered complete *Miranda* warnings. Elstad waived his rights and gave a full confession.

An Oregon trial court excluded the pre-*Miranda* warning statement, but convicted Elstad after finding that Elstad had made a voluntary confession after waiving his *Miranda* rights. *Id.* at 1290. Elstad appealed his conviction, contending that his unwarned admission "let the cat out of the bag" and rendered the later confession "fruit of the poisonous tree." *Elstad,* 105 S. Ct. at 1289. The appeals court accepted this argument and ruled that the unwarned statement exerted a "coercive impact" on Elstad's later confession. *Id.* at 1290.

The United States Supreme Court, in an opinion by Justice O'Connor, reversed the Oregon Court of Appeals. The Supreme Court did not perceive Elstad's unwarned admission as exerting a coercive effect on Elstad's subsequent confession. The heart of the decision was the enunciation of the proposition that not all *Miranda* violations implicate fifth amendment rights. Only coerced statements in violation of *Miranda* constitute a contravention of constitutional rights so as to require the suppression of the violation's derivative evidence. *Elstad,* 105 S. Ct. at 1290–91.

■ However, in the factual context of a series of uncoerced admissions, the relevant inquiry involves examination of the circumstances surrounding each particular admission. The circumstances of one admission should not affect the analysis of a subsequent admission. If a defendant's self-incriminating statement follows the administration and voluntary waiver of *Miranda* rights, then the statement will not be excluded. The fact that the defendant may have made a previous, unwarned statement will not taint the later warned and voluntary admission. *Id.*

■ Obviously, the Supreme Court's definition of "coercion" is of fundamental importance in analyzing *Elstad.* Only coerced statements will require suppression of derivative evidence. The *Elstad* decision made it clear that, to amount to coercion, the police interrogation must rise to the level of "physical violence or other deliberate means calculated to break the suspect's will." *Id.* at 1295. The Court expressly rejected the contention that a suspect's voluntary disclosure of a "guilty secret" exerts a detrimental psychological

effect that undermines the suspect's ability to make a fully voluntary waiver of *Miranda* rights. *Id.*

The ramifications of *Elstad* on the present case are clear. Defendant's initial response to Officer Dobmeier's interrogatory of "Hey, Jay," was completely uncompelled and uncoerced. Defendant may have been foolish in answering Dobmeier, but he was not subjected to the sort of physical violence or oppressive interrogation that would mandate the exclusion of all subsequent statements. The absence of actual coercion before the administration of the defendant's *Miranda* rights permits our *Elstad* inquiry to proceed to a consideration of the defendant's post-*Miranda* warning statements. Again, the crucial question is whether the defendant made a knowing and voluntary waiver of his constitutional rights.

The record shows that the police provided the defendant with a full and complete explication of his *Miranda* rights. The defendant elected to talk without any pressure from the law enforcement authorities. The only possible instance of coercion occurred after the defendant had waived his rights. During the ensuing interrogation session, the police confronted the defendant with his earlier acknowledgment to "Hey, Jay." The defendant's brief correctly notes that defendant's incriminating statement regarding other robberies occurred only after the officers referred to his unwarned response. In essence, the defendant argues that the police allusion to the unwarned statement constituted coercion. However, the *Elstad* decision specifically states that an uncoerced disclosure of a "guilty secret" does not exert a coercive effect on post-*Miranda* warning admissions or undermine the validity of a defendant's waiver. *Elstad,* 105 S. Ct. at 1295. Nor does the record indicate that the police used "physical violence" or other methods "calculated to break [defendant's] will," such as an extended interrogation session. *Id.* at 1295 and n.3. In addition, the fact that law enforcement authorities present a suspect with incriminating evidence does not entail coercion. *Johnson v. Hall,* 605 F.2d 577 (1st Cir. 1979); *see also Frazier v. Cupp,* 394 U.S. 731 (1969) (defendant does not confess involuntarily when confession is prompted by false information that a codefendant has turned State's evidence).

The defendant next contends that *Elstad* is distinguishable because the unwarned interrogation in *Elstad* occurred in the noncoercive atmosphere of Elstad's home. The defendant is correct in pointing out that the *Elstad* decision used the domestic context of the interrogation as a factor in concluding that the initial statement was uncoerced. *Elstad,* 105 S. Ct. 1296–97. However, the high court nowhere states or implies that it is limiting its holding to casual,

living-room questioning sessions. The *Elstad* court's examination of the fact pattern before it was part of the application of its test, not part of the test itself. The test remains whether the police employed heavy-handed, coercive tactics such as torture or other "deliberate means" to extract the initial unwarned statement. The fact that *Elstad* was questioned at home was simply an aspect to be considered in determining whether actual coercion had been exerted. Thus, the domestic context of the *Elstad* interrogation was a sufficient, but not an exclusive, basis on which to find an uncoerced admission.

■ Employing the *Elstad* standard we do not find the presence of police coercion that vitiated the defendant's voluntary waiver of rights. The absence of coercion rendered the defendant's warned statements uncompelled and thus admissible at trial.

■■ Although the trial judge did not err in admitting the defendant's warned statement, we must now determine whether the trial court committed prejudicial error when it admitted into evidence defendant's unwarned statement. In determining the gravity of an error, this court asks "whether it can be said beyond a reasonable doubt that the inadmissible evidence did not affect the verdict." *State v. Ruelke*, 116 N.H. 692, 694, 366 A.2d 497, 498 (1976). The evaluation of whether this standard has been achieved involves consideration of the alternative evidence presented at trial. We have held that an "overwhelming nature of other evidence" will satisfy this standard. *State v. Dumais*, 126 N.H. 532, 535, 493 A.2d 501, 503 (1985).

■ An examination of the record reveals a plethora of alternative evidence. The accomplice whose affidavit prompted Officer Dobmeier's unconstitutional interrogation identified the defendant as "Jay." The accomplice's description of the defendant's attire on the night of the robbery matched the victim's description of his assailant. In addition, the same type of gun that the accomplice described as in the defendant's possession on the night of the robbery was discovered in the vehicle in which police arrested the defendant. Lastly, and most significantly, the defendant's offer to disclose information on other robberies was properly admitted. The overwhelming quantity of this supplementary evidence demonstrates beyond a reasonable doubt that the inadmissible evidence did not affect the verdict.

The defendant's last argument is that the trial court committed reversible error when it refused to submit the defendant's instruc-

tions on accomplice testimony to the jury. The defendant asserts that since Holly Baker's testimony was uncorroborated, the court was required to admonish the jury that her testimony could not be accepted if it appeared "bald perjury, preposterous or self-contradictory." *State v. West*, 112 N.H. 317, 319, 295 A.2d 457, 458 (1972).

It is apparent from the outset that the trial court does not have to accept a party's requested instructions provided that the instructions given accurately reflect the applicable law. *State v. Mayo*, 127 N.H. 67, 69, 497 A.2d 853, 854 (1985). Our inquiry thus turns to an examination of whether the trial judge's instructions encompassed the requirement of *State v. West*, or whether the instructions omitted considerations that should have been included. The record discloses that the trial judge did instruct the jury extensively on evaluating a witness's credibility. The court referred the jury to such factors as a witness's interest or lack of interest in the trial's outcome, bias or prejudice, and whether the testimony is reasonable. Even if one assumes Baker's testimony was uncorroborated, the trial judge's instructions as to testimonial credibility more than adequately addressed the negative factors of perjury and self-contradiction enumerated in *West*. If Baker's testimony had appeared incredible and unreasonable, it would also have appeared perjurious, preposterous or self-contradictory. There is no need to burden the jury with a profusion of redundant terms when several will suffice. The trial judge need not have used the specific terms of *West* in order to implement *West's* purpose. No error was committed in refusing to submit to the jury the defendant's requested instructions.

*Affirmed.*

JOHNSON, J., did not sit; the others concurred.