Strafford
No. 86-390

### THE STATE OF NEW HAMPSHIRE

v.

### RICHARD COLBATH

March 10, 1988

*Stephen E. Merrill*, attorney general (*Robert B. Muh*, assistant attorney general, on the brief, and *Michael D. Ramsdell*, attorney, orally), for the State.

*Hage & Hodes*, of Manchester (*Paul W. Hodes* and *F. Michael Keefe* on the brief, and *Mr. Hodes* orally), for the defendant.

SOUTER, J.  In this appeal from his conviction on a charge of aggravated felonious sexual assault, RSA 632-A:2, I, the defendant argues that the Superior Court (*Nadeau*, J.) should have dismissed the indictment for want of speedy trial and for the State's failure to disclose exculpatory evidence. The defendant assigns further error to rulings that barred the jury from considering evidence of the complainant's public behavior with men other than the defendant in the hours preceding the incident, as bearing on the defense of consent. On the last ground raised, we reverse and remand for a new trial.

During the noon hour of June 28, 1985, the defendant, Richard Colbath, went with some companions to the Smokey Lantern tavern in Farmington, where he became acquainted with the female complainant. There was evidence that she directed sexually provocative attention toward several men in the bar, with whom she associated during the ensuing afternoon, the defendant among them. He testified that he had engaged in "feeling [the complain-

ant's] breasts [and] bottom [and that she had been] rubbing his crotch" before the two of them eventually left the tavern and went to the defendant's trailer. It is undisputed that sexual intercourse followed; forcible according to the complainant, consensual according to the defendant. In any case, before they left the trailer the two of them were joined unexpectedly by a young woman who lived with the defendant, who came home at an unusual hour suspecting that the defendant was indulging in faithless behavior. With her suspicion confirmed, she became enraged, kicked the trailer door open and went for the complainant, whom she assaulted violently and dragged outside by the hair. It took the intervention of the defendant and a third woman to bring the melee to an end.

As soon as the complainant returned to town she accused the defendant of rape, and the police promptly arrested and charged him accordingly. During the initial investigation on the evening of June 28, Candice Lepene, the daughter of the tavern's owner, told the police that she had seen the complainant leave the tavern with the defendant during the afternoon. In a subsequent written statement, however, she said that she did not know whether the complainant had left with a companion or alone, but she described the complainant prior to her departure as "a girl with dark hair hanging all over everyone and making out with Richard Colbath and a few others." The police did not disclose this statement to the defense prior to trial, although defense counsel knew that Lepene had given a statement and subpoenaed her to testify at trial.

For reasons we will go into below, the defendant was not brought to trial until one year had passed from his arrest, during which time he was free on bail. The trial itself focused on the defense of consent, which the defendant addressed by his own testimony about the complainant's behavior with him at the bar and at the trailer, and by seeking to elicit exculpatory evidence that the complainant had appeared to invite sexual advances from other men as well as from himself in the hours preceding the incident. Some of this evidence was excluded and some admitted. During the charge, however, the judge instructed the jury, subject to the defendant's objection, that evidence of the complainant's behavior with other men was irrelevant to the issues before them. This appeal followed the verdict of guilty.

Before reaching the central issue of this appeal, arising from the jury instruction, we have two threshold matters to deal with, beginning with the defendant's request to dismiss the indictment for failure to provide a speedy trial. Since defense counsel made no reference to part I, article 14, or to any other provision of the

State Constitution, we consider the issue solely under the sixth and fourteenth amendments of the Constitution of the United States. *See State v. Dellorfano*, 128 N.H. 628, 633, 517 A.2d 1163, 1166 (1986). The federal-State distinction is, however, academic here, because ever since *State v. Cole*, 118 N.H. 829, 831, 395 A.2d 189, 190 (1978), we have decided issues raised under article 14 in criminal cases by engaging in the same factor analysis adopted in *Barker v. Wingo*, 407 U.S. 514, 530–33 (1972), for resolving federal speedy trial claims.

■■ Under *Barker*, we assess the reasonableness of pretrial delay by considering its length, the reasons for it, the extent of the defendant's affirmative efforts to shorten it and the existence of any prejudice to the defendant produced by it. *Id.* at 530. Although the length of time prior to trial is never alone dispositive of a speedy trial claim, *see State v. Weitzman*, 121 N.H. 83, 86, 427 A.2d 3, 5 (1981) (thirteen-month delay); *see also Barker v. Wingo, supra* at 523 (five-year delay), the superior court follows a policy of inquiring into the reasons for delay whenever a felony case remains untried nine months after indictment, *State v. Perron*, 122 N.H. 941, 951, 454 A.2d 422, 428 (1982), and we will likewise assume that reaching the nine-month check point signals enough presumptive prejudice to warrant review under the remaining criteria.

The reasons for the delay in this case were the vicissitudes of scheduling; the case was not reached the first time it was listed for trial and was not reached soon enough to complete trial in the time available the second time around. To be sure, the time was inadequate because the trial judge had plans to leave on a vacation. But if this was not the strongest institutional reason for further postponement, we should bear in mind that the time available before the vacation would have appeared sufficient to try the case, if defense counsel had not increased his estimate of necessary trial time at the last minute.

Be that as it may, we place substantial emphasis on the facts relevant under the two remaining factors, *see State v. Langone*, 127 N.H. 49, 55, 498 A.2d 731, 735 (1985), which militate against awarding relief. The defendant himself never initiated a speedy trial request, and it was only during a hearing scheduled on the court's own motion that the defendant asked for dismissal. The State, indeed, showed far more initiative, for after the case had been scheduled for trial in September, 1986, it was the State's counsel, not the defendant, who asked the court to move the date up to June of that year.

■ Nor does the record disclose any significant prejudice to the defendant caused by the twelve-month wait. *See Barker v. Wingo*, 407 U.S. at 532–33 (cognizable prejudice may take the form of incarceration, anxiety and impairment of defense). He was free on bail, and while his counsel suggests that the defendant may have lost his job as a result of the pre-trial delay, there is no evidence to support the speculation. Although the defendant may well have been vexed by pretrial publicity, some of it perhaps inaccurate, and although he was surely anxious about the outcome of the pending proceedings, there is no indication that he suffered more than any defendant normally does. Finally, the record discloses no actual impairment to the defense, despite claims that the year's delay led to dimmed memories and the loss of a potentially favorable witness, who died a few weeks before trial. The transcript of testimony carries no suggestion that any witness forgot facts in the year after the event, and the one lost witness would have testified only to the complainant's public behavior in the tavern, a subject upon which that witness's evidence would merely have been cumulative to the testimony of others. Hence, we conclude there is no sufficient reason to find unreasonable delay in bringing the case to trial.

Next, we confront an even less serious issue, in the defendant's argument that the indictment should have been dismissed for the State's failure, prior to the beginning of trial, to disclose a copy of Candice Lepene's written statement that she had seen the complainant in close contact with the defendant and others in the tavern. The State does not deny that the reference to the complainant's provocative activities on the afternoon in question was exculpatory in supporting the defense of consent. Nor does the State have any explanation beyond supposed inadvertence for the failure of the police to produce the statement before trial, either to the prosecutor or to the defendant. The State does not, therefore, deny that the statement should have been given to the defense in accordance with the due process mandate of *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory evidence. *See Moore v. Illinois*, 408 U.S. 786 (1972). The State does deny, however, that the defendant had grounds to seek dismissal or any other relief, once the statement had been produced at trial and read to the jury. We are of the same mind.

■■ As soon as the exculpatory statement was delivered to the defendant during trial, there was no longer a continuing *Brady* violation. Although the defendant seems to think that the delay in disclosing the statement should have entitled him to some relief, he forgets that relief for a *Brady* violation requires proof that the

violation somehow caused him prejudice. *Brady v. Maryland, supra* at 88; *State v. Arthur*, 118 N.H. 561, 563, 391 A.2d 884, 885 (1978); *State v. Dukette*, 113 N.H. 472, 477, 309 A.2d 886, 889 (1973). The defendant had no right to relief, beyond production of the evidence itself, unless he could demonstrate that the delay in producing it ultimately harmed him in some way. He not only failed to show any such prejudice, however; he failed even to claim it. We need say no more, except perhaps to add that the State would be well advised to remind its police investigators of the rule in *Brady*.

Thus, we reach the principal and meritorious issue in this appeal, raised by the defendant's objection to the jury instruction that evidence of the complainant's behavior with men other than the defendant in the hours preceding the incident was immaterial, or irrelevant, to the question of the defendant's guilt or innocence. Because the instruction came as the culmination of a series of evidentiary rulings made during trial, we will touch on those rulings briefly, as a prologue to considering the instruction itself.

The trial judge first allowed the defense to elicit testimony from the complainant that at one point during the afternoon she had been sitting in the lap of one of the defendant's companions named Gillis. Shortly after that testimony, and before the defendant had called any witnesses, the State moved for a ruling *in limine* to prohibit defense witnesses from testifying about the complainant's behavior in the tavern with any other men than the defendant. Although the defendant's trial counsel objected, he failed to make any offer of proof required by New Hampshire Rule of Evidence 103(b)(2) in order to preserve an objection to the exclusion of evidence. The court nonetheless permitted counsel to address the issue with extensive argument, which finally ended with a ruling granting the prosecution's motion, for the stated reason that the complainant's "conduct with others is not material on the issue of whether or not she consented to have sexual intercourse with" the defendant. The court later supplemented this reason with the alternative grounds that the testimony in question was inadmissible as evidence of character, and inadmissible as well under the rape shield law, RSA 632-A:6, which bars evidence of "[p]rior consensual sexual activity between the victim and any person other than" the defendant, when offered to prove an offense under RSA chapter 632-A.

This ruling did not end the matter, however. Although the court had ordered defense counsel not to ask his own witnesses about the complainant's behavior with third parties, further evidence of such activity did come in through the State's next witness, Candice Lepene. She testified on direct examination that the complainant

had left the tavern in the company of various men several times during the afternoon, and the court admitted her statement to the police, quoted above, that she had seen "a girl with dark hair hanging all over everyone and making out with Richard Colbath and a few others." On cross-examination Lepene was permitted to testify further about her earlier statement.

When it came time for jury instructions, however, the court's charge reflected its earlier ruling on the motion *in limine*. First, the judge reminded the jurors that he had received evidence of the complainant's public activities with various men on the afternoon of the 28th, including her own admission that she had engaged in close physical contact with at least one man besides the defendant. Then the judge explained that he had allowed the jury to hear this testimony only to provide background information, and he went on to instruct the jurors plainly that the complainant's "conduct with other individuals is not relevant on the issue of whether or not she gave consent to sexual intercourse."

That part of the charge was tantamount to an instruction that the jury could not consider the evidence in question as bearing on guilt or innocence, and we therefore treat it as equivalent to an order striking the testimony about the complainant's openly observed behavior with other men during the course of the afternoon. The defendant made a timely objection to this instruction.

It is not immediately apparent from the transcript whether the trial judge based this instruction on his reading of the rape shield law, or on the other reasons given for the related evidentiary rulings during trial (*i.e.*, materiality or relevance, and the rule limiting the use of character evidence). In this appeal, however, each party has seen the issue as turning solely on the proper application of the rape shield law's bar against admitting evidence of "[p]rior consensual sexual activity between the victim and any person other than the [defendant]," RSA 632-A:6, and we will accordingly review the instruction with reference to the applicability of the shield law to the evidence previously admitted. If the evidence should have been excluded under the shield law, the instruction was right; if the evidence was admissible, the instruction was wrong.

The defendant has suggested that we address this issue simply as one of statutory construction, by holding that the shield law's mandate to exclude evidence of "consensual sexual activity" with others can have no application to overt sexual activity of the complainant in a bar open to the public. This was, indeed, the

position taken by defendant's trial counsel, who relied on prior construction of the act as intended to honor the complainant's interest in preserving the privacy of intimate activity. *See, e.g., State v. Howard,* 121 N.H. 53, 59, 426 A.2d 457, 461 (1981); Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom,* 77 COLUM. L. REV. 1, 41 (1977) ("[T]he trauma of baring one's intimate past to the eyes of the world—turning one's bedroom into a showcase—overshadows the usual discomfort of testifying . . . to one's biases, lies or even convictions of criminal acts." (Footnote omitted.)).

While we do not reject this argument, we are not disposed to rule on it here. The State did not address the argument's merits at all in its brief, and we prefer not to rule on a legal position so little remarked upon by one side of the case when, as here, existing precedent provides a clear conceptual framework for the resolution of the issue before us.

That framework began to emerge in the first appeal to question the applicability of the shield law after its enactment in 1975. *See* Laws 1975, 302:1; *State v. Howard supra.* Despite the absolute terms of the shield law's prohibition, our cases have consistently reflected the common recognition that such a statute's reach has to be limited by a defendant's State and national constitutional rights to confront the witnesses against him and to present his own exculpatory evidence. N.H. CONST. pt. I, art. 15; *State v. Howard supra;* U.S. CONST. amend. VI; *see Davis v. Alaska,* 415 U.S. 308, 316 (1974) (amend. VI confrontation right includes right to cross-examine); *Washington v. Texas,* 388 U.S. 14, 19 (1967) (amend. VI guarantees right to present defense witnesses); *Pointer v. Texas,* 380 U.S. 400, 403 (1965) (amend. VI applicable against States). Thus, this court has held that a rape defendant must be given an opportunity to demonstrate that the "probative value [of the statutorily inadmissible evidence] in the context of that particular case outweighs its prejudicial effect on the prosecutrix." *State v. Howard, supra* at 59, 426 A.2d at 461. *But see* Tanford and Bocchino, *Rape Victim Shield Laws and the Sixth Amendment,* 128 U. PA. L. REV. 544, 570 (1980) (countervailing prejudice is risk of jury irrationality, not harm to victim's feelings).

It is on such a determination of relative weight, then, that the jury instruction in question must stand or fall. In the normal case, of course, this weighing process takes place in a hearing outside the jury's presence, before any evidence is admitted, *see State v. Howard,* 121 N.H. at 58–59, 426 A.2d at 427, and the record of that hearing is a principal focus of any later review by this court. In

this case, however, where the shield law is assumed to be the basis for the instruction striking evidence previously admitted, we look to the record of testimony that the jury actually heard, to determine whether it was inadmissible in the first place, and therefore properly subject to being stricken later on.

As soon as we address this process of assigning relative weight to prejudicial and probative force, it becomes apparent that the public character of the complainant's behavior is significant. On the one hand, describing a complainant's open, sexually suggestive conduct in the presence of patrons of a public bar obviously has far less potential for damaging the sensibilities than revealing what the same person may have done in the company of another behind a closed door. On the other hand, evidence of public displays of general interest in sexual activity can be taken to indicate a contemporaneous receptiveness to sexual advances that cannot be inferred from evidence of private behavior with chosen sex partners. *See State v. Goulet,* 129 N.H. 348, 351, 529 A.2d 879, 881 (1987) (evidence of sexual promiscuity not necessarily admissible in spite of shield law); *State v. Shute,* 122 N.H. 498, 446 A.2d 1162 (1982) (evidence of mere predilection for promiscuity too remote).

In this case, for example, the jury could have taken evidence of the complainant's openly sexually provocative behavior toward a group of men as evidence of her probable attitude toward an individual within the group. Evidence that the publicly inviting acts occurred closely in time to the alleged sexual assault by one such man could have been viewed as indicating the complainant's likely attitude at the time of the sexual activity in question. It would, in fact, understate the importance of such evidence in this case to speak of it merely as relevant. We should recall that the fact of intercourse was not denied, and that the evidence of assault was subject to the explanation that the defendant's jealous living companion had inflicted the visible injuries. The companion's furious behavior had a further bearing on the case, as well, for the jury could have regarded her attack as a reason for the complainant to regret a voluntary liaison with the defendant, and as a motive for the complainant to allege rape as a way to explain her injuries and excuse her undignified predicament. With the sex act thus admitted, with the evidence of violence subject to exculpatory explanation, and with a motive for the complainant to make a false accusation, the outcome of the prosecution could well have turned on a very close judgment about the complainant's attitude of resistance or consent.

■ Because little significance can be assigned here either to the privacy interest or to a fear of misleading the jury, the trial court was bound to recognize the defendant's interest in presenting probably crucial evidence of the complainant's behavior closely preceding the alleged rape. Thus, the facts of this case well illustrate the court's previous observation that the sexual activities of a complainant immediately prior to an alleged rape may well be subject to a defendant's constitutional right to present evidence. *See State v. LeClair*, 121 N.H. 743, 746, 433 A.2d 1326, 1329 (1981) and cases cited; *cf. State v. Goulet supra; State v. Shute supra.* The demand of the Constitutions is all the clearer when those activities were carried on in a public setting. Because the jury instruction effectively excluded the evidence in question, the conviction must be reversed and the case remanded for a new trial.

*Reversed and remanded.*

All concurred.