NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2019-0072

THE STATE OF NEW HAMPSHIRE

v.

JOSHUA L. SHAW

Argued: June 24, 2020
Opinion Issued: November 19, 2020

Gordon J. MacDonald, attorney general (Susan P. McGinnis, senior assistant attorney general, on the brief and orally), for the State.

Stephanie Hausman, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

HANTZ MARCONI, J. The defendant, Joshua L. Shaw, appeals his conviction following a jury trial for a violation count of driving after license suspension, see RSA 263:64 (2014), and misdemeanor counts of enhanced simple assault, see RSA 631:2-a, I(a) (2016); RSA 651:6, I(g) (2016); attempted enhanced simple assault, see RSA 629:1 (2016); RSA 631:2-a, I(a); RSA 651:6, I(g); resisting arrest, see RSA 642:2 (2016); and disobeying an officer, see RSA 265:4, I(e) (2014). On appeal, he argues the Superior Court (Delker, J.) erred by: (1) denying his motion for in camera review of any disciplinary actions involving the police officers in his case and any prior "use of force" reports they filed; and (2) instructing the jury that the crime of disobeying an officer requires the State to prove that the defendant "refused to produce his driver's

license on demand of a law enforcement officer for the purposes of examination by the officer." We affirm.

The jury could have found the following facts. On March 14, 2018, while Salem Police Officer Feole was on patrol, he saw a pickup truck pass by with its rear plate area completely covered in snow. Because of the snow, the truck's registration sticker was not visible, but the truck was pulling a utility trailer with a visible Michigan registration. Feole ran the Michigan registration number and discovered that the trailer was registered to the defendant whose New Hampshire operating privileges had been suspended in 2015 for failing to pay child support.

Upon pulling over the truck, Feole walked to the driver's side of the vehicle, introduced himself, and explained that he had stopped the vehicle because its rear license plate was obscured by snow and because he suspected that the defendant was the registered owner of the trailer and was driving despite his privilege for doing so being suspended. The defendant was in the driver's seat, his girlfriend was in the passenger seat, and there was a large dog between them. When Feole asked the defendant for his license and registration, the defendant was immediately hostile and refused to provide his license. Feole explained again why he had pulled over the vehicle. Feole asked the defendant if he was the registered owner of the trailer, and the defendant confirmed that he was, but still refused to give Feole his license. The defendant's girlfriend started to record the encounter with her cell phone.

At one point, the defendant removed a card, which looked like a license, from the visor, telling Feole that "his license was all good," that he "got it a couple of weeks ago," and that, therefore, there was no reason for the stop. When Feole asked if the defendant would hand him the license, the defendant refused, folded papers around the card, and put the card back in the visor. Feole calmly explained that, by refusing to give him the license, the defendant was committing a misdemeanor for which he could be arrested. To this, the defendant said, "Well, then, let's get on with the getting arrested then. Let's just get right on with it, so I can sue the company, sue the State. It's good to me. . . . I was just up to the, uh, child support. I've already done everything I needed to do. You might as well get your supervisor right out here."

Feole informed the defendant that he was under arrest, and because he estimated that the defendant weighed approximately twice as much as he, Feole radioed for backup. Officer MacKenzie, Sergeant Genest, and Lieutenant Fitzgerald arrived on the scene. Feole, MacKenzie, and Genest approached the truck, and Feole told the defendant to leave the vehicle; however, the defendant refused to do so. Feole tried to open the door, but the defendant slammed it shut, locked it, rolled up the window, and yelled, "Get your f***ing hands off the door you. . . . Get the f*** off me!" The officers told the defendant several times that he was under arrest and had to exit the truck, but he refused. The

2

officers informed the defendant that if he did not exit the truck, they would have to smash the window and pull him out because he was under arrest. When the defendant failed to exit, Genest smashed the truck window with his flashlight, and the officers attempted to unlock the driver's side door, but were unable to do so. As the officers tried to pull the defendant through the truck window, he began throwing punches, kicking his feet at them through the window, and yelling, "Get out of here. Get the f*** off."

MacKenzie fired his taser's prongs into the defendant, who swatted them away and continued kicking at the officers and swinging his fists at them, with a set of keys held between his knuckles. The officers repeatedly ordered the defendant to open the door, but he kept kicking and punching. MacKenzie fired his taser's second set of prongs into the defendant; the defendant pulled them out and kept fighting. MacKenzie then put the taser on the defendant's leg and administered a "drive stun," which occurs when the end of the taser is held against the skin of a target, but the taser's prongs are not fired.

The defendant continued to resist, yelling, "You guys. What the f*** is wrong with you guys?" An officer responded, "You're under arrest. You're resisting." When the defendant asked why he was being arrested, he was told that he was being arrested for assaulting two police officers. At this point, Genest pulled out his taser and told the defendant, "Open that door. You'll get it again." Genest then fired his taser's prongs into the defendant, and he and MacKenzie repeatedly yelled to the defendant to open the door. The defendant pulled out the prongs, but did not open the door.

The officers then went to the passenger side of the truck. Genest knocked on the passenger side door and told the defendant's girlfriend to exit the vehicle. She refused even after being told that she, too, was under arrest. The defendant yelled, "Nobody's getting out of this vehicle," and reached over to lock the passenger side door. After more yelling from the defendant, MacKenzie administered another drive stun.

Genest told the defendant's girlfriend to open her door and exit the truck or else he was going to smash her window. She yelled, "No, no, no! My dog!" Genest broke the window, and after more yelling from the defendant, Genest unlocked the passenger side door. The defendant's girlfriend got out of the truck and stopped recording the encounter.

The dog left the truck, and Genest and Feole tried to pull the defendant out. The defendant punched at Genest and Feole and held onto the steering wheel. Genest wrapped his arms around the defendant's head and pulled. MacKenzie hit the defendant's hands and wrists until the defendant lost his grip on the steering wheel. Then, Feole, Fitzgerald, and Genest pulled the defendant from the truck. He landed on his stomach and tucked his hands underneath his body.

Two more officers arrived, Officers DiChiara and DeFeudis. Officers repeatedly ordered the defendant to put his arms behind his back, but he refused. When they tried to pull his arms out from under his stomach, he resisted. DiChiara pulled out his taser and gave the defendant a direct shock on his bare back. Feole again tried to pull the defendant's right arm, but the defendant again resisted.

Because verbal commands, "soft-hand controls," and taser use had been ineffective, Feole punched the defendant in the rib area. The defendant released his right arm sufficiently so that Feole could put it behind his back and place handcuffs on it. The defendant refused to release his left arm, however, so DiChiara gave him another direct shock. The defendant then took his left arm out from under his stomach, and the officers placed handcuffs on it.

I. Motion for In Camera Review

Before trial, the defendant filed a motion for in camera review of "information concerning any and all matters whereby force was used on an individual and involving any of the Salem Police officers involved in [his case]" and "information concerning any and all disciplinary actions regarding the Salem Police officers involved in [his case]." Citing State v. Gagne, 136 N.H. 101 (1992), the defendant argued that in camera review "is the appropriate method to be employed when [a] defendant seeks materials which are subject to a privilege." The defendant asserted that "[t]here is a reasonable probability that an in-camera review will reveal information relevant to [his] defense" that "any force used by him was justified due to the excessive and unlawful force of the Salem Police officers." He argued, "By way of example, information concerning disciplinary actions of the involved officers and any previous use of force employed by these officers is highly relevant to this defense." He observed that the arrest of another individual earlier in 2018 "involved an excessive use of force and use of tasers," and that some of the officers who arrested him "may very well have" been involved in that earlier arrest. He further noted that the officers who used tasers on him did not follow the Salem police department's internal practices and procedures.

The State objected, citing RSA 105:13-b (2013), and asserting that the defendant had failed to meet his burden under Gagne of demonstrating that there was a reasonable probability that the personnel files of the officers contained evidence relevant and material to his defense. The State informed the court that, contrary to the defendant's speculation, "[t]here were no officers that were involved in the traffic stop and arrest of the Defendant that were also involved in the arrest of [the other individual]." The State also contended that the police department's internal policies regarding the use of tasers were, in fact, followed by the officers involved in the defendant's case. Thus, the State

argued, "[b]oth of the Defendant's reasons for requesting the officer[s'] personnel records are refuted by the evidence in the case."

The State further contended that "[i]f there was exculpatory information contained in the officer[s'] personnel files relating to their credibility, it would be disclosed to the Defendant." The State asserted: "That is not the case here."

The State also argued that the reports requested by the defendant regarding the use of force against other individuals were not relevant because the State had already provided a cell phone video taken by the defendant's girlfriend of nearly the entire encounter between him and the police, which he could use on cross-examination to explore the officers' use of force against him. The State contended that "the jury can draw conclusions based on the evidence contained in the video and the [officers'] testimony, as well as any evidence presented by the defendant regarding whether he acted in self-defense." The State further asserted that the defendant had failed to establish that the officers' prior use of force was relevant to whether or not he acted in self-defense. In short, the State argued, "[t]he disclosure of prior use of force reports will not have any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." The trial court denied the motion for the reasons set forth in the State's objection and stated: "The defendant has failed to meet [his] burden to trigger in camera review of the police personnel or other internal police files." (Bolding omitted.)

We review trial court decisions on the management of discovery under our unsustainable exercise of discretion standard. State v. Ainsworth, 151 N.H. 691, 694 (2005). To satisfy this standard, the defendant must demonstrate that the trial court's decision is clearly untenable or unreasonable to the prejudice of his case. Id.

RSA 105:13-b provides:

> I. Exculpatory evidence in a police personnel file of a police officer who is serving as a witness in any criminal case shall be disclosed to the defendant. The duty to disclose exculpatory evidence that should have been disclosed prior to trial under this paragraph is an ongoing duty that extends beyond a finding of guilt.
>
> II. If a determination cannot be made as to whether evidence is exculpatory, an in camera review by the court shall be required.
>
> III. No personnel file of a police officer who is serving as a witness or prosecutor in a criminal case shall be opened for the purposes of obtaining or reviewing non-exculpatory evidence in

5

that criminal case, unless the sitting judge makes a specific ruling that probable cause exists to believe that the file contains evidence relevant to that criminal case. If the judge rules that probable cause exists, the judge shall order the police department employing the officer to deliver the file to the judge. The judge shall examine the file in camera and make a determination as to whether it contains evidence relevant to the criminal case. Only those portions of the file which the judge determines to be relevant in the case shall be released to be used as evidence in accordance with all applicable rules regarding evidence in criminal cases. The remainder of the file shall be treated as confidential and shall be returned to the police department employing the officer.

RSA 105:13-b.

As amended in 2012, RSA 105:13-b "explicitly codifies the distinction we have recognized between exculpatory evidence that must be disclosed to the defendant under the State and Federal Constitutions, and other information contained in a confidential personnel file that may be obtained through the procedure set forth in paragraph III of RSA 105:13-b." Duchesne v. Hillsborough County Attorney, 167 N.H. 774, 781 (2015) (quotation, ellipsis, and brackets omitted); compare RSA 105:13-b, with RSA 105:13-b (2001). As we explained in Duchesne:

> [I]n a criminal case, the State is obligated to disclose information favorable to the defendant that is material to either guilt or punishment. This obligation arises from a defendant's constitutional right to due process of law, and aims to ensure that defendants receive fair trials. The duty to disclose encompasses both exculpatory information and information that may be used to impeach the State's witnesses, and applies whether or not the defendant requests the information. Essential fairness, rather than the ability of counsel to ferret out concealed information, underlies the duty to disclose.
>
> . . . .
>
> The prosecutor's constitutional duty of disclosure extends only to information that is material to guilt or to punishment. Favorable evidence is material under the federal standard only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . [T]he New Hampshire Constitution affords defendants greater protection than the federal standard[.] . . . [U]pon a showing by the defendant that favorable,

6

exculpatory evidence has been knowingly withheld by the prosecution, the burden shifts to the State to prove beyond a reasonable doubt that the undisclosed evidence would not have affected the verdict. This standard does not require that the prosecutor disclose everything that might influence a jury, or that the defendant be permitted a complete discovery of all investigatory work or an examination of the State's complete file.

Duchesne, 167 N.H. at 777-78 (citations and quotations omitted). RSA 105:13-b does not and "cannot limit the defendant's constitutional right to obtain all exculpatory evidence." Id. at 781 (quotation omitted).

RSA 105:13-b "addresses three situations that may exist with respect to police officers who appear as witnesses in criminal cases." Id. "First, insofar as the personnel files of such officers contain exculpatory evidence, paragraph I requires that such information be disclosed to the defendant." Id. "Exculpatory," in this context, refers to favorable evidence that is material to guilt or punishment, evidence that the State is constitutionally required to disclose to the defense. See id. at 778.

"Next, paragraph II covers situations in which there is uncertainty as to whether evidence contained within police personnel files is, in fact, exculpatory." Id. at 781. Paragraph II "directs that, where such uncertainty exists, the evidence at issue is to be submitted to the court for in camera review." Id.

"Finally, paragraph III covers evidence that is non-exculpatory but may nonetheless be relevant to a case in which an officer is a witness." Id. at 782. "Non-exculpatory" means relevant evidence that the State is not constitutionally required to disclose to the defense. See id. at 778. "Consistent with our case law, this paragraph prohibits the opening of a police personnel file to examine the same for non-exculpatory evidence unless the trial court makes a specific finding that probable cause exists to believe that the file contains evidence relevant to the particular criminal case." Id. at 782.

"Probable cause," in this context, refers to "a reasonable probability that the records contain information that is . . . relevant" to a defendant's case. Gagne, 136 N.H. at 105; see State v. Puzzanghera, 140 N.H. 105, 107 (1995).[1]

---

[1] In cases construing the pre-2012 version of RSA 105:13-b, we held that "to trigger an in camera review of a police officer's personnel file under RSA 105:13-b, the defendant must establish probable cause to believe the file contains evidence relevant to his case in a manner analogous to the principles set forth in Gagne." Puzzanghera, 140 N.H. at 107. To trigger in camera review of confidential and/or privileged records under Gagne, "the defendant must establish a reasonable probability that the records contain information that is material and relevant to his defense." Gagne, 136 N.H. at 105. In cases construing the pre-2012 version of RSA 105:13-b, we applied the Gagne standard of relevance and materiality. See, e.g., Ainsworth, 151 N.H. at 694-95.

Stated differently, a defendant must "establish that there is a realistic and substantial likelihood" that relevant evidence would be obtained from the file. State v. Amirault, 149 N.H. 541, 544 (2003) (quotation omitted) (interpreting prior version of RSA 105:13-b). "To meet this threshold requirement, a defendant must present a plausible theory of relevance . . . sufficient to justify review of otherwise protected documents." Id. "A plausible theory is sufficient if it provides some specific concern, based on more than bare conjecture, that, in reasonable probability, will be explained by the information sought in the records." Id. (quotation omitted). Records are "relevant" if they have "any tendency to make a fact more or less probable than it would be without the evidence, and . . . the fact is of consequence in determining the action." N.H. R. Ev. 401. "When records are known to exist" and a defendant has "generally and fairly characterized" them, "we have not required [the defendant] to articulate with precision the . . . relevance of the requested information to [the] defense." Amirault, 149 N.H. at 544.

The defendant first argues that only his request for disciplinary actions is governed by RSA 105:13-b, III. He asserts that the prior "use of force" reports he sought "were not likely to be contained in personnel or other internal police files," and, therefore, that RSA 105:13-b, III does not apply to them. However, as the State aptly observes, the defendant did not make this argument in the trial court. Generally, parties may not have judicial review of matters not raised in the forum of trial. Bean v. Red Oak Prop. Mgmt., 151 N.H. 248, 250 (2004). "The purpose underlying our preservation rule is to afford the trial court an opportunity to correct any error it may have made before those issues are presented for appellate review." State v. Town, 163 N.H. 790, 792 (2012). Because the defendant failed to argue in the trial court, as he argues on appeal, that RSA 105:13-b, III does not apply to the "use of force" reports, we decline to consider his appellate argument substantively.

The defendant next asserts that both the prior "use of force" reports and the disciplinary actions he sought constitute exculpatory information and, therefore, the State was compelled to provide them to him under RSA 105:13-b, I, and Part I, Article 15 of the New Hampshire Constitution. See State v. Laurie, 139 N.H. 325, 327-30 (1995). This, too, as the State observes, is an

---

In State v. Girard, 173 N.H. ___, ___ (decided October 16, 2020) (slip op. at 8), we explained that, for the purposes of the Gagne standard, evidence "is material only if there is a reasonable probability that" its disclosure will produce a different result in the proceeding, and that a "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." (Quotations omitted.)

Now that RSA 105:13-b has been amended to distinguish between "exculpatory" and "non-exculpatory" evidence, and in light of our decision in Girard, we conclude that a defendant need not show that it is reasonably probable that evidence in a police personnel file is "material" in order to trigger in camera review, but need only show the reasonable probability that it is "relevant" to his case. Of course, if the legislature disagrees with our construction of RSA 105:13-b, it is free to amend the statute as it sees fit, within constitutional limitations. See State v. Proctor, 171 N.H. 800, 807 (2019).

argument that the defendant did not raise in the trial court, and we, therefore, decline to consider it on appeal. See State v. Dellorfano, 128 N.H. 628, 632 (1986) (discussing the requisites of preserving a state constitutional argument for appellate review).

We, thus, limit our review to whether the defendant met his burden under RSA 105:13-b, III as to the prior "use of force" reports. Although, in the trial court, the defendant also argued that he met his burden as to the disciplinary actions involving the officers, he has not briefed this argument on appeal, and we, therefore, consider it waived. See In re Estate of King, 149 N.H. 226, 230 (2003).

The defendant argues that an officer's prior use of force against another individual was relevant and material to his defense that his use of force against the officers was justified by their excessive and unlawful use of force against him. He likens this case to Petition of State of N.H. (State v. Theodosopoulos), 153 N.H. 318 (2006). He asserts that, in that case, we "held that [Theodosopoulos] met the threshold showing to require review of [a] personnel file for information about an officer-witness's 'use of police vehicles' in a case in which the officer [and Theodosopoulos were] involved in a motor vehicle accident." The defendant argues that, similar to Theodosopoulos, "[he] sought information about the officer-witnesses' use of force in other on-the-job situations."

The defendant's reliance on Petition of State of N.H. (State v. Theodosopoulos) is misplaced. In that case, the defendant's request for information was limited to exculpatory evidence. Petition of State of N.H. (State v. Theodosopoulos), 153 N.H. at 321. Because the defendant was "not requesting generalized information that [might] be contained in [the officer's] confidential personnel file, the threshold finding of probable cause and subsequent in camera review, as set forth in RSA 105:13-b, [were] not required." Id. at 322. Thus, the case offers no guidance as to how to apply RSA 105:13-b, III.

Although the standard for in camera review under RSA 105:13-b, III "is not unduly high, we conclude that the defendant's representation falls short of meeting it." Ainsworth, 151 N.H. at 695. The defendant's conclusory statement in his motion that "information concerning disciplinary actions of the involved officers and any previous use of force employed by these officers is highly relevant to [his] defense" does not constitute a plausible theory of relevance sufficient to justify review of otherwise protected documents, particularly given the cell phone video of nearly the entire encounter from which the jury could reach its own conclusions as to the validity of his defense of self-defense. See id. (holding that the defendant's representation that information in the personnel files "might have some bearing on his defense of self-defense" did not meet the "reasonable probability" standard). The

9

defendant has, therefore, failed to demonstrate that the trial court's decision constituted an unsustainable exercise of discretion.  See id.

### I.  Jury Instruction on the Disobeying an Officer Charge

The disobeying an officer charge alleged that the defendant committed the offense when, "while driving or in charge of a vehicle," he "knowingly refused on demand of a law enforcement officer . . . to produce his license to drive such vehicle."  During trial, on cross-examination, Feole was asked whether the defendant "produced" his license.  Feole testified that he believes that the word "produce" in that context means that the driver either physically hands him the license or "let[s] [him] observe it, read it thoroughly so [he] can actually see the details of it."  Feole testified that with that understanding of the word "produce," the defendant did not "produce" his license.  He agreed, however, that if the word means, "hey, I grab my license, and I pull it out, and I show it to you," then the defendant did "produce" his license.

On the second day of trial, after the State rested, the defendant moved to dismiss the disobeying an officer charge on the ground that the evidence showed that "in fact, he did produce his license.  He actually showed it to the officer, and the officer said he couldn't read it."  The trial court concluded that the evidence was sufficient for the jury to infer that the defendant did not "adequately produce the license in a way that . . . meets the needs . . . or the purpose of the statute."  See RSA 265:4, I(e).

The defendant requested that the court instruct the jury that the statute distinguishes between producing a license and "handing it over," and that he had been charged with failing to produce the license, not with failing to "hand the license over."  Although the State objected to the proposed instruction, the trial court decided that "given the testimony in the case, . . . it does make sense to draw the jury's attention to that distinction."  The court explained that it would "accompany that instruction" with "a dictionary definition of the word produce" so that the jury could "adequately assess whether the circumstances of the Defendant's interaction [met] that definition."

Thereafter, the court and counsel discussed a proposed instruction on the disobeying an officer charge:

> [THE COURT]: In terms of . . . the issue of producing the license. I've taken a look at the statute again . . . . The statute says, refuses on demand of such officer to produce his license to drive such vehicle . . . or to permit such officer to take his license . . . in hand, and this is the key phrase, for the purpose of examination.  So I actually think that that phrase "for the purpose of examination" belongs to both produce and take in hand.

So I've amended the language of the charge to say . . . the Defendant refused to produce his license on demand of a law enforcement officer for the purpose of examination by the officer. And then I've defined the word "produce" . . . to mean, to offer to view, exhibit, or to show. And added the sentence, the Defendant is not charged with the crime [of] refusing to permit the officer to take the license in hand. I should note that the [dictionary] actually uses, as an example of that definition, to produce your license to a police officer. . . .

[DEFENSE COUNSEL]: Judge, as to the disobeying, that's not what he was charged with. . . . [H]e's charged with knowing refusal on demand of officers to produce his license to drive such vehicle. That's what he's being charged with. That's what it is.

So I think that you've added . . . [language] that's not actually what the charge was. So I'd ask that you use the same language that's in the complaint . . . .

And then as far as the definition to produce, I understand what you're saying to [the jury] and that's fine. But I don't think you can change -- you've changed substantively the charge, and maybe the statute allows that or maybe the statute even says that or maybe there's different variants of the statute, but that's not how it's charged. . . . So I just -- so I'm just asking the Court to track what we've been defending against this whole trial and use the same language [as is in the charge]. And as far as produce, . . . I have no objection to that.
. . . .

[THE COURT]: I hear what you're saying, [defense counsel], that the Court is effectively amending the complaint which I think can be done at this juncture. But I also don't think that there's prejudice to that. I think the . . . language in the statute, which says, for the purpose of examination, means the same thing as the term produce means. . . . I think that the purpose of the statute is to produce your license to allow an officer to examine that license. . . . I don't think it changes the essence of the crime with which the Defendant has been charged. . . .
. . . .

. . . I agree that if the State had requested to amend the charge to say, hand over the license to the officer[,] . . . [t]hat would be a substantive change to the crime that the Defendant was charged with. I don't think correctly informing the jury on the law of the elements of the charge, that is to produce for purposes of

11

examination, changes the substance of the crime . . . that the Defendant has been charged with in this case.

Consistent with this colloquy, the jury was instructed as follows on the disobeying an officer charge:

> The Defendant's also been charged with the crime of disobeying an officer. That definition has three elements. Again, each of which the State must prove beyond a reasonable doubt. So for this crime the State must prove the following:
>
> The Defendant acted knowingly, as I've defined that term for you; number 2, the Defendant was driving or in charge of a motor vehicle; and number 3, <u>the Defendant refused to produce his driver's license on demand of a law enforcement officer for the purpose of examination by the officer</u>.
>
> Now, the crime of disobeying an officer requires the State to prove that the Defendant refused to produce his driver's license. The term "produce" means to offer to view, exhibit, or to show. The Defendant, in this case, is not [charged] with the crime [of] refusing to permit the officer to take the license in hand.

(Emphasis added.)

On appeal, the defendant argues that the trial court's jury instruction is based upon a misinterpretation of the disobeying an officer statute, RSA 265:4, I(e). We evaluate allegations of error by interpreting the disputed instructions in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case. State v. Martin, 171 N.H. 590, 599 (2018). We determine whether the jury instructions adequately and accurately explain each element of the offense and reverse only if the instructions did not fairly cover the issues of law in the case. Id.

Deciding whether the trial court's jury instruction is consistent with the statute requires that we engage in statutory interpretation. We review the trial court's statutory interpretation de novo. See State v. Furgal, 164 N.H. 430, 435 (2012) ("[W]hether a statute provides a basis for a requested jury instruction raises a question of statutory interpretation, which we review de novo."). We are the final arbiter of the legislature's intent as expressed in the words of the statute considered as a whole. State v. Woodbury, 172 N.H. 358, 366 (2019). We first look to the language of the statute itself, and, if possible, construe it according to its plain and ordinary meaning. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. We construe criminal offenses defined by statute according to

12

the fair import of their terms and to promote justice.  See RSA 265:4, II, III (2014) (setting forth criminal penalties for violating paragraph I); RSA 625:3, :7 (2016).  We interpret a statute in the context of the overall statutory scheme and not in isolation.  State v. Gardner, 162 N.H. 652, 653 (2011).  "Our goal is to apply statutes in light of the legislature's intent in enacting them and in light of the policy sought to be advanced by the entire statutory scheme."  Id. (quotation omitted).

RSA 265:4, I(e) provides that "[n]o person, while driving or in charge of a vehicle, shall . . . [r]efuse, on demand of such officer, to produce his license to drive such vehicle or his certificate of registration or to permit such officer to take the license or certificate in hand for the purpose of examination."  As both parties agree, RSA 265:4, I(e) precludes two acts: (1) refusing to produce a driver's license or certificate of registration to an officer; and (2) refusing to permit the officer to take the license or certificate in hand.

The parties dispute whether the phrase "for the purpose of examination" applies to both acts or only to the second act (refusing to permit the officer to take the license or certificate in hand).  The defendant argues that, contrary to the trial court's jury instruction, the phrase "for the purpose of examination" modifies the clause "to permit such officer to take the license or certificate in hand" and does not modify the clause "to produce his license to drive such vehicle or his certificate of registration."  The State contends that the phrase modifies both clauses.

As both parties correctly observe, RSA 265:4, I(e) mirrors RSA 263:2 (2014), and, therefore, the two statutes must be interpreted together.  See State v. Farrow, 140 N.H. 473, 475 (1995) (stating that statutes pertaining to the same subject matter "are to be considered in interpreting" one another and will be construed "so that they do not contradict each other" (quotations omitted)).  RSA 263:2 requires every driver to "have his driver's license upon his person or in the vehicle in some easily accessible place" and to "display the same on demand of and manually surrender the same into the hands of the demanding officer for the inspection thereof."  (Emphasis added.)  Under RSA 263:2, "No person charged with a violation of this section shall be convicted if, within a period of 48 hours, he produces in the office of the arresting officer evidence that he held a valid driver's license which was in effect at the time of his arrest."

Thus, pursuant to RSA 263:2, a driver is required either to "display" his or her driver's license or to "manually surrender" it upon demand by a law enforcement officer.  The purpose of both acts (displaying and surrendering) is to enable the officer to inspect the license to determine its validity.  Likewise, pursuant to RSA 265:4, I(e), a driver who fails either to "produce" his or her driver's license or to permit the officer to take it "in hand" commits the crime of disobeying an officer.  RSA 265:4, I(e), thus, criminalizes the refusal to do

13

either of the two acts required by RSA 263:2.  Accordingly, interpreting RSA 263:2 and RSA 265:4, I(e) together, we conclude that the phrase "for the purpose of examination" in RSA 265:4, I(e) applies both to refusing to produce a driver's license or certificate of registration to an officer and to refusing to permit the officer to take the license or certificate in hand.  See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012) (explaining that, under the "series-qualifier" canon of construction, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series," a modifier at the end of the list "normally applies to the entire series" (bolding and capitalization omitted)).

The defendant contends that had the legislature intended the phrase to modify both verbs (producing and permitting), it would have worded the statute differently.  The State counters that the purpose of RSA 263:2 is to allow an officer to determine whether the license is valid, and that the defendant's interpretation would undermine that purpose because it would allow a driver to comply with RSA 263:2 and avoid prosecution for violating RSA 265:4, I(e) by displaying his or her license "for less time than is necessary" for a law enforcement officer to make that determination.  The State further contends that the defendant's interpretation would lead to an absurd and unjust result because "a driver who permitted an officer to take his license in hand, but then took it back before the officer could examine it would be guilty of violating the statute, but a driver who flashed his license for a second would not."

We agree with the State that the defendant's interpretation is contrary to the legislature's intent in enacting RSA 263:2 and RSA 265:4, I(e).  We conclude that to give effect to that intent, the phrase "for the purpose of examination" must refer to both of the variants of disobeying an officer in RSA 265:4, I(e), refusing to produce a license or registration and refusing to permit the officer to take the license or registration in hand.  Thus, we hold that the trial court's jury instruction on the disobeying an officer charge was based upon a correct interpretation of the statute.

Affirmed.

HICKS and BASSETT, JJ., concurred.

14