# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

ROBERT D. STEWART, JR., aka
Robert Wilson Stewart, Bob
Stewart,
          *Defendant-Appellant.*

No. 03-10662

D.C. No.
CR-03-00061-HDM

OPINION

Appeal from the United States District Court
for the District of Arizona
Howard D. McKibben, District Judge, Presiding

Argued and Submitted
December 7, 2004—San Francisco, California

Filed August 23, 2005

Before: Diarmuid F. O'Scannlain, Robert E. Cowen,* and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

*The Honorable Robert E. Cowen, Senior United States Circuit Judge
for the Third Circuit, sitting by designation.

11211

## COUNSEL

Thomas E. Haney, Esq., argued the cause for the appellant.

Patrick Schneider, Esq., Office of the U.S. Attorney, argued the cause for the appellee; Paul Charlton, Michael T. Morrissey, and Soo C. Song, Office of the U.S. Attorney, were also on the brief.

## OPINION

BEA, Circuit Judge:

We are asked to determine whether certain words, spoken under certain circumstances, constitute criminal threats of harm against a federal judge and are not protected by the First Amendment. We are also asked to determine what quantum of evidence the Government must present to establish that a defendant, who solicited another person to murder a federal judge, had the required criminal intent for the other person to commit the murder.

## FACTS

Robert D. Stewart, Jr. appeals his convictions and sentence for threatening to murder a federal judge (Count 1), soliciting the murder of a federal judge (Count 4), and making material false statements to government agents investigating the threats and solicitation (Counts 2 and 3).[1] At trial, the Government elicited the following testimony:

---

[1] Count 1 alleged Stewart threatened to murder U.S. District Judge Roslyn O. Silver, in violation of 18 U.S.C. § 115(a)(1)(B). Counts 2 and 3

Informant August Weiss, an inmate at an Arizona federal prison where Stewart was also incarcerated,[2] approached Special Investigative Agent Forrest Barton, who was stationed at the prison. Weiss told Agent Barton "there was an older inmate named Rob in his unit that was making some plans to hurt some federal officials." Agent Barton and Federal Bureau of Investigation ("FBI") Special Agent Mike Gallante met with Weiss; Weiss identified "Rob" as Stewart.

Shortly after Stewart's arrival at the prison, Stewart stated to Weiss that "[FBI] agents should be like strung up on light posts." Weiss asked him if he was serious, and Stewart responded, "[W]ell, it would be a nice thing." Stewart also asked Weiss if he "knew somebody that could have somebody done away with."

Stewart's statements wavered between targeting FBI agents or a judge, but then became specific: U.S. District Judge Roslyn O. Silver, who had presided at Stewart's earlier trial. Weiss testified Stewart stated "he wanted to string the motherfucker up and cut her throat, his throat, and make it like a copycat so that people would do the same thing."[3] Stewart offered Weiss weapons and $100,000 as a reward if Weiss

alleged Stewart made material false statements to government agents on November 13, 2002 and January 10, 2003, respectively, in violation of 18 U.S.C. § 1001(a)(2). Count 4 alleged Stewart solicited another person to engage in a violent crime, to wit, to murder Judge Silver, in violation of 18 U.S.C. § 373(a).

[2]At the time of these events, Stewart was incarcerated pursuant to his earlier convictions for felony possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and unlawful possession of a machine gun, in violation of 18 U.S.C. § 922(o). *See United States v. Stewart*, 348 F.3d 1132, 1134 (9th Cir. 2003), *vacated and remanded*, 125 S. Ct. 2899 (2005). Those earlier convictions are not at issue here.

[3]Weiss understood the "copycat" comment to mean that the killing "would make other extremists go around and start killing government agents, judges, you know, all kinds of agents."

could arrange the killing. Stewart claimed the money would come from the Aryan Brotherhood.

Weiss agreed with Agent Barton and Special Agent Gallante to record secretly a conversation with Stewart, using a hidden digital recorder provided by the FBI. Weiss met with Stewart and recorded their conversation.[4] During the meeting, Stewart asked if Weiss "could do it," meaning whether Weiss could "do the hit." Stewart offered weapons to be given as compensation to Weiss's brother-in-law to perform the hit (Weiss had invented a fictitious brother-in-law who would do the killing), and $100,000 to Weiss as a reward for arranging the hit. Stewart stated his sister had access to the weapons and could deliver them to Weiss's brother-in-law. Stewart stated the Aryan Brotherhood was also targeting the judge and would contribute money "to go in on the hit," and he again mentioned the "copycat" murder strategy. Stewart then described the victim as fifty-five years old, with blonde hair, having the name of "Silver," and located in Phoenix, Room 624. Weiss asked Stewart how he wanted the killing done, and Stewart made a cutting motion with his finger across his throat. After the meeting, Weiss immediately delivered the recording to Agent Barton and Special Agent Gallante.

Special Agent Gallante then interviewed Stewart twice. During the first interview, Special Agent Gallante told Stewart he had reason to believe Stewart was involved in a conspiracy to harm a federal judge. Stewart responded: "I'm not involved in anything like that, and especially I wouldn't want to harm my judge, Judge Silver, because I'm appealing my case . . . ." Special Agent Gallante asked Stewart whether he said "anything that could even be misinterpreted as a threat to a judge." Stewart denied saying anything, but mentioned he had overheard the Aryan Brotherhood "wanted to harm Judge Silver because she had sentenced one of their associates."

---

[4]During the meeting, Agent Barton and Special Agent Gallante monitored Weiss via the video security system installed in the prison.

During the next interview, Special Agent Gallante again asked Stewart whether he said "anything which could have been misinterpreted by anyone regarding any threats to a judge." Stewart replied no, but stated Weiss had been asking a lot of questions about his case, and Weiss had said "something about his brother coming here to do something." Special Agent Gallante then played the portion of the recording in which Stewart identified Judge Silver and gave her physical description and location. Stewart became "visibly upset" by the recording. When Special Agent Gallante asked Stewart what he was referring to in that conversation, Stewart had no response. Over Stewart's objection, the recordings were played to the jury.

Judge Silver also testified for the Government. She presided over Stewart's previous criminal trial, in which Stewart was convicted and sentenced to prison for the federal firearm offenses. Judge Silver testified that during the previous trial, Stewart was initially respectful and polite, but as the trial progressed, his demeanor turned to what Judge Silver described as anger or "smoldering rage." She testified Stewart's change in demeanor was precipitated by her not permitting Stewart to pursue a particular line of defense, *i.e.*, that the federal government had no jurisdiction or authority over Stewart. Judge Silver stated she never received any threats directly from Stewart but was so informed by the U.S. Marshals Service and the FBI. She also stated that, at the time Stewart spoke to Weiss, a reasonable description of her would be fifty-six years old, female, with blonde hair, and that her courtroom was on the sixth floor of the Phoenix courthouse, room number 604 or 624.

Following the Government's case-in-chief, Stewart brought a motion for judgment of acquittal on all counts, which the district court denied. Stewart then testified in his defense and denied making any threats regarding Judge Silver or soliciting her murder. Several character witnesses also testified Stewart had a reputation for truthfulness. The jury then found Stewart

guilty on all counts. The district court denied Stewart's renewed motion for judgment of acquittal and sentenced Stewart to 60 months each on Counts 1, 2, and 3, to run concurrently, and 232 months on Count 4, to run consecutively to Counts 1, 2, and 3. Stewart timely appealed. We have jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## DISCUSSION

Stewart raises multiple challenges to his convictions. We address each in turn.

## I.   Multiplicity of the Indictment

As a preliminary matter, Stewart contends Counts 1 and 4 are multiplicitous, and thus that his convictions on both counts violate the Double Jeopardy Clause. He makes the same claims as to Counts 2 and 3. The district court rejected both sets of claims in its denial of Stewart's motion to dismiss.

[1] The claim that an indictment has resulted in multiplicitous convictions is reviewed *de novo*. *United States v. Vargas-Castillo*, 329 F.3d 715, 718-19 (9th Cir. 2003). An indictment is multiplicitous when it charges multiple counts for a single offense, producing two penalties for one crime and thus raising double jeopardy questions. *Id.* However, two counts within an indictment are not multiplicitous if "each separately violated statutory provision requires proof of an additional fact which the other does not." *Id.*; *see United States v. Stearns*, 550 F.2d 1167, 1172 (9th Cir. 1977) ("Congress has the power to establish that a single act constitutes more than one offense, at least as long as each offense requires proof of a fact the other does not."). We turn to the first claim of "multiplicity."

### A.   Counts 1 and 4 — Threatening to murder a federal judge, and soliciting another person to murder a federal judge

Count 1 alleged Stewart threatened to murder Judge Silver with the intent to impede, intimidate, or retaliate against her on account of the performance of her official duties, in violation of 18 U.S.C. § 115(a)(1)(B). Section 115(a)(1) provides in pertinent part:

> Whoever . . . (B) threatens to assault, kidnap, or murder . . . a United States judge . . . with intent to impede, intimidate, or interfere with such . . . judge . . . while engaged in the performance of official duties, or with intent to retaliate against such . . . judge . . . on account of the performance of official duties, shall be punished . . . .

However, Count 4 alleged Stewart solicited *another person* to murder Judge Silver, in violation of 18 U.S.C. § 373(a). Section 373(a) provides in part:

> Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned . . . .

**[2]** Count 1 required proof Stewart threatened to murder Judge Silver; the participation of Weiss was unnecessary. On the other hand, Count 4 required proof Stewart solicited Weiss to murder Judge Silver; proof Stewart made a threat against her was unnecessary. Thus, both counts required proof of a fact the other did not. Counts 1 and 4 are not multiplicit-

ous; the district court properly denied Stewart's motion to dismiss Count 1 or 4 on such ground.

### B. Counts 2 and 3 — Making material false statements to FBI agents

Stewart also argues Counts 2 and 3 are multiplicitous because they derive from identical false statements he made in response to identical questions from Special Agent Gallante. 18 U.S.C. § 1001(a) provides in part: "[W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully— (2) makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined . . . or imprisoned . . . ." Here, Stewart has a point.

**[3]** We have previously held that, under section 1001(a)(2), "where identical false statements, in either oral or written form, are made in response to identical questions, the declarant may be convicted only once." *United States v. Olsowy*, 836 F.2d 439, 443 (9th Cir. 1988). This is so because the repetition of a false statement by a declarant does not further impair the operations of the government beyond the initial violation, and a contrary rule would permit the government to pile on multiple convictions by repeatedly asking a declarant the same question. *Id.* at 442-43. We later refined the *Olsowy* holding into a two-element test. The government may charge separate violations for identical false statements under section 1001(a)(2) if: (1) the declarant was asked the same question and gave the same answer; and (2) the later false statement further impaired the operations of the government. *United States v. Salas-Camacho*, 859 F.2d 788, 791 (9th Cir. 1988).

A comparison of the two cases helps to illuminate our analysis. In *Olsowy*, the defendant received a Social Security check, which was endorsed and cashed. 836 F.2d at 440. The defendant later claimed he had never received the check. The same government agent interviewed the defendant twice

within a two-week span. The agent asked the defendant during the first interview "whether he had received the check," and during the second interview, the agent stated he believed the defendant had endorsed the check and filed a fraudulent claim. *Id.* In both instances the defendant denied receiving the check. *Id.* The defendant was later convicted of, *inter alia*, two counts of making false statements in violation of section 1001(a)(2). *Id.* We reversed the conviction on one of the counts, holding the defendant's identical responses to identical questions, even though both false, allowed for indictment on only one count. *Id.* at 443.

Unlike *Olsowy*, *Salas-Camacho* reached the opposite result. There, the defendant was crossing the United States-Mexico border. 859 F.2d at 789. He was asked by a primary customs inspector whether he was bringing anything back with him from Mexico. *Id.* The defendant answered "No." *Id.* The primary inspector referred the defendant to a secondary inspector who asked the defendant what he was bringing back from Mexico. *Id.* The defendant replied he had nothing to declare. *Id.* Through a computer search, the secondary investigator at the border learned the defendant earlier had illegally imported steroids. The defendant then admitted he had illegal steroids in his truck. The defendant was convicted of, *inter alia*, two counts of making false statements in violation of section 1001(a)(2). *Id.* We held the counts were not multiplicitous because the defendant's denial to the secondary inspector further impaired the operations of the government. *Id.* at 791. We reasoned both inspectors had different duties: the primary inspector to make a preliminary determination whether an entrant should be allowed over the border, and the secondary inspector

> to conduct a more searching examination, including, as in this case, a computer search to determine any prior violations. Both the primary and the secondary customs inspectors, in making their respective determinations and discharging their respective duties,

rely on information obtained from the entrant. Where, as here, the entrant makes a false statement to both inspectors, the ability of both officials to carry out their respective functions is impaired.

*Id.*

We agree with Stewart that the facts here are more like *Olsowy* than *Salas-Camacho*. The same FBI agent asked Stewart twice whether he had threatened a federal judge, and Stewart made identical denials both times. Although Stewart mentioned the Aryan Brotherhood during the first interview and Weiss during the second interview, the FBI already had that information by virtue of the recording and Weiss's participation.

**[4]** Special Agent Gallante's testimony did not establish any additional impairment to his investigation because of the second interview. Special Agent Gallante testified that, after the first interview, the government "had every man on alert" in an attempt to thwart any attempt to harm Judge Silver. After the second interview, the government interviewed Stewart's family members to trace the weapons to be used as payment. But again, at the time of Stewart's second denial, the FBI already had the information leading to those areas of investigation. Thus, it cannot be said Stewart's second denial "further impaired the operations of the government." *See id.* Hence, Counts 2 and 3 were indeed multiplicitous, and the district court erred in not entering an acquittal on either Count 2 or 3. We therefore reverse Stewart's conviction as to Count 3.

## II. Sufficiency of the Evidence

Where a defendant moves for acquittal at the close of the government's evidence, we review *de novo* whether sufficient evidence exists to support a guilty verdict. *United States v. Carranza*, 289 F.3d 634, 641 (9th Cir. 2002). In reviewing for

sufficiency of the evidence, we assess the evidence " 'in the light most favorable to the prosecution,' determining whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Orozco-Santillan*, 903 F.2d 1262, 1264 (9th Cir. 1990) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). We "must respect the province of the jury to ascertain the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict." *Id.*

## A.   Count 1 — Threatening to murder a federal judge

Stewart contends there is insufficient evidence to support his conviction on Count 1 for threatening to kill Judge Silver. Because Stewart's threats were spoken words, he also claims error through violation of his First Amendment rights.

To resolve Stewart's claim, we undertake a two-step analysis to assess the sufficiency of the evidence for convictions regarding threats. First, we determine whether the verdict is supported by sufficient evidence. *See United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002). If sufficient evidence is found, we then review *de novo* "whether the facts as found by the jury establish the core constitutional fact, in this case, a 'true threat.' " *Id.*

### 1.   Sufficiency of the evidence on Count 1

**[5]** Stewart's conviction under 18 U.S.C. § 115(a)(1)(B) required the Government to prove: (1) the defendant; (2) threatened to murder; (3) a U.S. judge; (4) with the intent to impede, intimidate, interfere with, or retaliate against that judge; (5) on account of the judge's performance of her official duties. *See Orozco-Santillan*, 903 F.2d at 1265.

**[6]** Here, there is sufficient evidence to support a rational jury's finding of guilt, beyond a reasonable doubt, that Stewart violated section 115(a)(1)(B). Stewart stated he wanted to target a judge and "string the motherfucker up and cut her throat, his throat, and make it like a copycat so that people would do the same thing."[5] Stewart later identified Judge Silver as the target and provided Weiss with her physical description and location. Stewart stated he would provide weapons and money to have the deed done. The recording of Stewart's meeting with Weiss was played to the jury. It allowed the jury to evaluate the tone of Stewart's voice, whether he was serious or joking, and the emphasis of the threats.

**[7]** Further, Judge Silver testified she was a judge in the federal court system, that she presided over Stewart's earlier trial which resulted in Stewart's conviction for federal firearm offenses, and that Stewart exhibited anger and "smoldering rage" toward her during the trial. The anger was precipitated by Judge Silver not permitting Stewart to pursue a particular line of defense. Those facts are sufficient to establish the five elements under section 115(a)(1)(B).

However, Stewart also argues section 115(a)(1)(B) requires a defendant to communicate the threat directly to the intended target, which concededly did not occur here. The district court rejected this argument, finding the statute contained no such requirement.[6]

**[8]** We agree with the district court for several reasons.

---

[5]A threat under section 115(a)(1)(B) is defined as "an expression of an intention to inflict evil, injury, or damage on another." *Orozco-Santillan*, 903 F.2d at 1265. Stewart's statement clearly constitutes a threat under that definition.

[6]The district court provided jury instructions stating in part: "To be a threat, it is not necessary that statement be expressly communicated to the object of the threat."

First, the statutory text of section 115(a)(1)(B) contains no such requirement. The only criminal act required is for the defendant to "threaten to assault, kidnap, or murder" one of the enumerated officials. *See* 18 U.S.C. § 115(a)(1)(B).

**[9]** Second, we have previously suggested no such requirement is included in the statute. In *United States v. Chase*, 340 F.3d 978 (9th Cir. 2003) (en banc), we affirmed the defendant's conviction under section 115(a)(1)(B) for threatening a federal law enforcement officer. *Id.* at 993. The defendant discovered the FBI was about to execute a search warrant at his home, and he told a telephone operator at his psychiatrist's office that "there are FBI Marshals that are on their way out to get me and if that happens, people are going to die." *Id.* at 980. We did not discuss whether section 115(a)(1)(B) required a direct threat to the proposed target. Yet we favorably cited a portion of the earlier three-judge panel opinion, *id.* at 992-93, which had approvingly quoted from the district court's jury instruction that "[i]t is not required that the defendant communicate the alleged threats to the objects of the alleged threats." *United States v. Chase*, 301 F.3d 1019, 1030-31 (9th Cir. 2002) (three-judge panel opinion).

**[10]** Third, other circuits to have considered this issue also have not required as an element that the defendant communicate the threat directly to the intended target. *See United States v. Martin*, 163 F.3d 1212, 1215-18 (10th Cir. 1998) (affirming the defendant's conviction for threatening a law enforcement officer even though the threats were only heard by the defendant's associate (who recorded the threats and reported them to law enforcement), and holding that the threats did not have to be directed to the target but only had to be received by a third party); *United States v. Raymer*, 876 F.2d 383, 391 (5th Cir. 1989) (affirming the defendant's conviction on two counts of threatening a federal probation officer even though the officer never directly received the threats, and holding that actual receipt of the threats by the proposed target was not required under the statute).

**[11]** We see no reason to insert a requirement into the statute that Congress did not insert itself. Accordingly, we hold that, under 18 U.S.C. § 115(a)(1)(B), a defendant need not communicate the threat directly to the intended target for a conviction under the statute; receipt of the threat only by a third party is sufficient, assuming the First Amendment requirements discussed below are also satisfied.

## 2. "True threats" for purposes of the First Amendment

**[12]** A core purpose of the First Amendment "is to allow 'free trade in ideas' — even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 358 (2003). Yet the First Amendment does not provide absolute protection to all types of expression; notable for our purposes here, the First Amendment does not protect so-called "true threats." *Id.* at 359.

**[13]** In defining a "true threat," our precedent has generally called for application of an objective test. That is, a statement is a "true threat" if "a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1058, 1074 (9th Cir. 2002) (en banc) (quoting *Orozco-Santillan*, 903 F.2d at 1265). We have utilized some form of that objective test for over thirty years. *See Roy v. United States*, 416 F.2d 874 (9th Cir. 1969) (holding that for purposes of 18 U.S.C. § 871, which proscribes threats made against the President, a threat is a "true threat" if "a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President . . . .").

**[14]** Yet in *United States v. Cassel*, 408 F.3d 622 (9th Cir. 2005), our holding suggested the objective "true threat" defi-

nition was no longer tenable in light of *Black*. We observed that, in *Black*, the U.S. Supreme Court defined "true threats" as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* at 631 (quoting *Black*, 538 U.S. at 359-60). We construed *Black*'s definition of a "true threat" to "embrace[ ] not only the requirement that the communication itself be intentional, but also the requirement that the speaker intend for his language to *threaten* the victim." *Id.* (emphasis in original). We observed *Black*'s definition was "in tension" with our earlier holdings applying the objective "true threat" definition, but concluded *Black* was irreconcilable with those earlier cases and thus *Black*'s definition must control. *Id.* at 633. Accordingly we held that "speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat." *Id.*

*Cassel* stated, however, that it did not address "the question of what effect our holding has on other specific statutes that we have previously held do not require the government to prove subjective intent." *Id.* at 633 n.8. 18 U.S.C. § 115(a)(1)(B) is such a statute. As noted, in *Orozco-Santillan*, we held the objective "true threat" definition applies in evaluating threats under section 115(a)(1)(B). Yet we decided *Orozco-Santillan* in 1990, before the U.S. Supreme Court's decision in *Black* in 2003, which raises the question whether *Black*'s subjective "true threat" definition *sub silentio* overruled the objective "true threat" definition used by *Orozco-Santillan* for purposes of section 115(a)(1)(B). *See Cassel*, 408 F.3d at 633.

Moreover, by its express language, section 115(a)(1)(B) contains a specific intent element: it punishes only threats made regarding enumerated officials with the intent to impede, intimidate, interfere with, or retaliate against such officials on account of the officials' performance of official

duties. Thus, a conviction under that statute could only be had upon proof that the speaker intended the speech to impede, intimidate, interfere with, or retaliate against the protected official. Such proof would seem to subsume the subjective "true threat" definition announced in *Black* and recognized by *Cassel*; one cannot have the intent required under section 115(a)(1)(B) without also intending to make the threat. *See id.* at 632 (stating that *Black*'s holding "thus affirms our own dictum—not always adhered to in our cases—that 'the element of intent is the determinative factor separating protected expression from unprotected criminal behavior.' " (quoting *United States v. Gilbert*, 813 F.2d 1523, 1529 (9th Cir. 1987)) (internal alteration omitted)).[7]

[15] Resolution of the issue whether to apply the objective or subjective "true threat" definition for purposes of section 115(a)(1)(B) is further complicated by our recent decision in *United States v. Romo*, No. 04-30131, 2005 WL 1560266 (9th Cir. July 5, 2005). There, in affirming the defendant's conviction under 18 U.S.C. § 871(a), we applied an objective definition to determine whether the defendant's statement that he wanted to "put a bullet in the President's head" was a "true threat." *Id.* at *6. In a footnote, we stated:

> The recent decision in *United States v. Cassel*, 408 F.3d 622 (9th Cir. 2005), does not change our view. *Cassel* leaves untouched the reasonable person analysis for presidential threats because it did not address whether statutes like 18 U.S.C. § 871(a) require intent. Because Romo has not raised First Amendment issues and *Cassel* does not alter the analysis of

---

[7]Indeed, in *Cassel*, we considered 18 U.S.C. § 1860, which punishes, *inter alia*, "[w]hoever, by intimidation . . . hinders, prevents, or attempts to hinder or prevent, any person from bidding upon or purchasing any tract of" federal land at public sale. After recognizing that "intent to threaten is a constitutionally necessary element of a statute punishing threats," we construed section 1860 to require such intent to save the statute from unconstitutionality. *Cassel*, 408 F.3d at 634-35.

presidential threats, we employ the decades-old approach to analyzing threats under 18 U.S.C. § 871(a).

*Romo*, 2005 WL 1560266, at *6 n.6 (internal citations omitted).

**[16]** We are not fully convinced that *Romo* properly distinguished *Cassel*, or that *Romo*'s continued use of the objective "true threat" definition is consistent with *Black*'s subjective "true threat" definition. Nonetheless, we need not decide whether the objective or subjective "true threat" definition should apply here.[8] That is because the evidence establishes that Stewart's statement was a "true threat" under either definition and thus is not protected by the First Amendment.

Under the objective definition, Stewart's statement that he wanted to target a judge and "string the motherfucker up and cut her throat, his throat, and make it like a copycat so that people would do the same thing," combined with an offer to provide weapons and money reward, can reasonably be interpreted as a serious expression of intent to harm or assault the target; here, a federal judge. *See Orozco-Santillan*, 903 F.2d at 1265-66 (affirming the defendant's conviction under 18 U.S.C. § 115(a)(1)(B) for threatening a federal agent where, after the agent arrested the defendant, the defendant stated he would "kick" the agent's "fucking ass," urged the agent to "box" with him, cursed at the agent, and pushed him); *cf.*

---

[8]Because *Romo*'s use of the objective standard was at least partially based on the defendant's failure to raise First Amendment issues, its holding does not imply we should back away from our decision in *Cassel*. Although *Cassel* did not involve 18 U.S.C. § 871(a), it held that proof of subjective intent would be required to effect a "true threat" where First Amendment issues were raised. *Cassel*, 408 F.3d at 633; *see Black*, 538 U.S. at 359-60. Presumably, a showing of intent would thus be required under 18 U.S.C. § 871(a) and 18 U.S.C. § 115(a)(1)(B) unless the government demonstrated a compelling interest in applying the objective test. *See Cassel*, 408 F.3d at 633 n.8.

*United States v. Schiefen*, 139 F.3d 638, 639 (8th Cir. 1998) (affirming the defendant's section 115(a)(1)(B) conviction for mailing to a U.S. district judge a letter stating a judgment of foreclosure was treasonous, and that "TREASON by law, is punishable by the DEATH PENALTY"; the court held the statements were "true threats" because a reasonable person would perceive the statements as threats). Although Judge Silver was not initially named as a target of the threat, Stewart later identified her as the target. Thus, Stewart's statement was a "true threat" under the objective definition.

Under the subjective definition—which asks whether "the speaker subjectively intended the speech as a threat," *Cassel*, 408 F.3d at 633—section 115(a)(1)(B) requires that Stewart have made the statement with the specific intent to impede, intimidate, interfere with, or retaliate against Judge Silver on account of the performance of her official duties.[9] We determined *supra* there was sufficient evidence presented to the jury to establish the existence of such specific intent, and that in turn is sufficient to show Stewart "subjectively intended the speech as a threat." *See id.*; *id.* at 637 n.14 ("The defendant might, of course, threaten to bring about the injury indirectly — for example, by having a third party harm the victim.").

**[17]** Accordingly, under either the objective or subjective "true threat" definition, Stewart's statements were "true

---

[9]It is well-settled that a speaker can subjectively intend the speech as a threat even if the speaker never actually intended to carry out the threat, such as where the speaker intends the threat to disrupt a protected official's performance of her official duties through intimidation or threatened retaliation. *See Black*, 538 U.S. at 360 ("[A] prohibition on true threats 'protects individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' " (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)) (internal alterations omitted)). For this reason, we reject Stewart's argument that his statements were not "true threats" because they were merely "jests to show toughness and to establish a position among other inmates."

threats" and are not protected by the First Amendment. We thus affirm Stewart's conviction on Count 1.

## B.   Count 2 — Making material false statements to FBI agents

Stewart also argues there is insufficient evidence to support his conviction on Count 2 for making material false statements to Special Agent Gallante. We reject this argument.

[18] 18 U.S.C. § 1001(a)(2) punishes any person who, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation . . . ." Special Agent Gallante asked Stewart whether he said "anything that could even be misinterpreted as a threat to a judge." Stewart falsely denied making any such statements, even though Stewart had earlier threatened Judge Silver and plotted with Weiss to order a "hit" on her life. His false statements were material because they had the capability of influencing a government agency's operations — as Special Agent Gallante testified, the FBI "had every man on alert" in an attempt to thwart any attempt to harm Judge Silver. *See Salas-Camacho*, 859 F.2d at 791 (explaining that a statement is "materially false" if it is capable of influencing the government agency's operations, and that the statement need not actually influence the agency). Those facts are sufficient for a rational jury to find beyond a reasonable doubt that Stewart violated section 1001(a)(2), and thus we affirm Stewart's conviction on Count 2.[10]

---

[10]Because we reverse Stewart's conviction on Count 3, we need not reach his claim of insufficient evidence as to that count.

### C. Count 4 — Soliciting another person to murder a federal judge

Stewart also contends there is insufficient evidence to support his conviction on Count 4. Specifically, Stewart argues there was insufficient corroboration of his intent under 18 U.S.C. § 373(a) because Weiss's testimony was inherently unreliable in that Weiss is a convicted felon.

18 U.S.C. § 373(a) provides in part:

> Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned . . . .

We have not before examined the meaning of the term "circumstances strongly corroborative of that intent." We review the construction and interpretation of a statute *de novo*. *United States v. Ventre*, 338 F.3d 1047, 1052 (9th Cir. 2003). We turn first to the plain meaning of the statute because, if we can interpret clearly its meaning from the statutory text, resort to legislative history is unnecessary. *Id.*

Section 373(a) punishes a person who solicits another person to engage in felonious conduct that includes the use, attempted use, or threatened use of physical force against property or against the person of another in violation of federal law, with the intent the other person engage in the conduct. The statute, through the use of the word "and," also requires that the solicitation occur "under circumstances strongly corroborative of that intent."

We are well-acquainted with the terms "corroborative" and "corroborate." *See* Black's Law Dictionary 596 (8th ed. 2004) (defining "corroborating evidence" as "[e]vidence that differs from but strengthens or confirms what other evidence shows (esp. that which needs support)"). The term "corroborative" means "serving or tending to corroborate," Webster's Third New Int'l Dictionary 512 (1965), and "corroborate" means "[t]o strengthen or confirm; to make more certain," Black's Law Dictionary, *supra*, at 370. *See* Webster's Third New Int'l Dictionary, *supra*, at 512 (defining "corroborate" as "to provide evidence of the truth of: make more certain: confirm"). In addition, "circumstance" means "[a]n accompanying or accessory fact, event, or condition, such as a piece of evidence that indicates the probability of an event." Black's Law Dictionary, *supra*, at 259; *see* Webster's Third New Int'l Dictionary, *supra*, at 410 (defining "circumstance" as "a condition, fact, or event accompanying, conditioning, or determining another").

The plain meaning of the phrase "circumstances strongly corroborative of that intent" thus shows that section 373(a) requires the government to present evidence of facts accompanying the solicitation strongly confirming that the defendant actually intended the solicited person to engage in the solicited violent crime. *See United States v. Korab*, 893 F.2d 212, 215 (9th Cir. 1989) (noting section 373(a) is focused upon punishing persons "who make[ ] a serious effort to induce another person to commit a crime of violence," regardless of "whether or not the crime of violence is actually committed"); *United States v. Gabriel*, 810 F.2d 627, 635 (7th Cir. 1987) (noting a violation of section 373(a) requires "the surrounding circumstances in general must indicate that the solicitor is serious that the person solicited actually carry out the crime."). Such corroborating evidence could consist of discussions or planning between the defendant and the person solicited regarding the crime to be committed, offers of payment, or the providing of information regarding the description or location of the proposed victim.

**[19]** We need not outline the precise limits of section 373(a) because Stewart's conduct squarely falls within the range of conduct prohibited by the statute. The Government presented evidence that: (1) Stewart specifically discussed with Weiss arranging the murder of Judge Silver;[11] (2) those discussions happened over the course of several meetings; (3) Stewart offered weapons and money for the murder; (4) Stewart provided Weiss with Judge Silver's description and location so Weiss's fictional brother-in-law could find her; and (5) Stewart suggested he wanted the murder committed by having Judge Silver's throat cut.[12] The evidence not only showed that Stewart solicited Weiss to have Weiss's fictional brother-in-law murder Judge Silver, but the circumstances accompanying the solicitation (*e.g.*, the multiple discussions between Stewart and Weiss, the offer of payment, the information on the whereabouts of the target, and the method of execution) strongly corroborated Stewart's intent to have the murder committed by Weiss's fictional brother-in-law. Such evidence is sufficient to support Stewart's conviction for a violation of section 373(a), and thus we affirm the conviction on Count 4.[13]

---

[11]It is a felony under federal law to kill or attempt to kill "any officer or employee of the United States . . . while such officer or employee is engaged in or on account of the performance of official duties." 18 U.S.C. § 1114.

[12]Although Stewart argues Weiss is inherently incredible because he is a convicted felon, much of the evidence corroborating the existence of Stewart's intent that Weiss's brother-in-law commit the murder was captured on the recording of the meeting between Stewart and Weiss, and this recording was played to the jury. As noted, in reviewing a conviction for sufficiency of the evidence, we "must respect the province of the jury to ascertain the credibility of witnesses," *Orozco-Santillan*, 903 F.3d at 1264, and we see no basis to depart from that principle here.

[13]We also reject Stewart's contention the district court erred by admitting the recording between Weiss and Stewart and by allowing the Government to play the recording for the jury. Stewart contends the recording was inadmissible because the Government did not preserve the original digital recording device but instead downloaded the data to disk and offered a duplicate of the recording at trial. Yet a duplicate recording is

### III.  Sentencing

[20] Because we reverse Stewart's conviction on Count 3, we remand to the district court for re-sentencing. *See United States v. Bennett*, 363 F.3d 947, 955-56 (9th Cir. 2004) ("When a defendant is sentenced on multiple counts and one of them is later vacated on appeal, the sentencing package comes 'unbundled.' The district court then has the authority to put together a new package reflecting its considered judgment as to the punishment the defendant deserved for the crimes of which he was still convicted.") (internal quotation marks omitted). On remand, the district court should re-sentence Stewart in light of the new advisory sentencing guidelines system mandated by *United States v. Booker*, 125 S. Ct. 738 (2005).[14]

### AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

admissible to the same extent as the original "unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Fed. R. Evid. 1003. In response to Stewart's objection at trial, the district court stated, "Prior to and during trial the Defendant never presented an expert to suggest that the recording had been altered, the defense had the recordings well in advance of trial and never suggested that the tape had been altered or fabricated." The district court did not abuse its discretion in admitting the recording because the record shows no evidence presenting a "genuine question" the duplicate recording was altered or otherwise tainted, and Stewart did not show any resulting unfairness from admission of the duplicate. *See United States v. Childs*, 5 F.3d 1328, 1335 (9th Cir. 1993).

[14]Because we remand to the district court for re-sentencing, we do not reach Stewart's arguments that his sentence constituted cruel and unusual punishment contrary to the Eighth Amendment, or that the district court erred in enhancing his sentence based upon facts not found by a jury beyond a reasonable doubt. Stewart's Motion for Leave to File a Supplemental Brief based upon *Booker* is denied as moot.