NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2017-0170


THE STATE OF NEW HAMPSHIRE

v.

MICHAEL HANES

Argued: March 8, 2018
Opinion Issued: July 18, 2018


Gordon J. MacDonald, attorney general (Susan P. McGinnis, senior assistant attorney general, on the brief and orally), for the State.


Christopher M. Johnson, chief appellate defender, on the brief and orally, for the defendant.


HANTZ MARCONI, J. The defendant, Michael Hanes, appeals his conviction, following a jury trial in Superior Court (McNamara, J.), for improper influence. See RSA 640:3 (2016). He argues that there was insufficient evidence to sustain the verdict, that the speech underlying his conviction enjoys constitutional protection, and that the trial court committed plain error in failing to sua sponte strike part of a witness's testimony. We affirm.

The relevant facts follow. The defendant lived in Pembroke, in an "older part of the town," on an "extremely narrow" street. His house was "very close to the street," and to get out his front door, he had to walk on the sidewalk. When the town's Department of Public Works (DPW) plowed the road after a snowfall, the snow bank would be up to the defendant's front steps.

The DPW plows the town roads and sidewalks according to policies and procedures established by the board of selectmen, including a snow removal policy plan that identifies the sequence in which roads and sidewalks are plowed. The town administrator, David Jodoin, was one of the town's employees responsible for implementing this plan. In addition, Jodoin was responsible for discipline and other personnel matters regarding town employees, supervising the department heads of several municipal departments, including the director of the DPW, advising those departments how to implement the town's policies and procedures and ensuring that they were followed, and responding to citizen complaints. The town has over 80 miles of road and employed eight town employees to plow the roads and sidewalks.

Around February 2015, the defendant contacted Jodoin and complained about the snow removal on his street and the fact that he had been "plowed in." Jodoin explained to the defendant that the town's board of selectmen had adopted a snow removal policy and that DPW employees "would go out and take care of it and clean it up once [they] could, but [they] were behind on the snow removal and . . . had other issues that [they] had to deal with, with sidewalks and things of that nature, . . . but [they] would be back." The defendant did not "threaten anyone during that conversation."

Approximately one year later, on February 16, 2016, the defendant again telephoned Jodoin to complain about the snow plowing. At 9:17 a.m., the defendant left the following message on Jodoin's voicemail as transcribed by the Pembroke Police Department:

> Dave Jodoin this is Mike Haynes [sic] . . . . I called you last year
> because we were having a problem with the city plowing the snow
> right up onto my sidewalk. Well today, and this isn't a whole [lot]
> of snow that we're getting, but they, the little bit of snow, it's
> accumulated in front of my house over the winter, they pushed all
> of that and the snow from today, last night up onto my damn
> sidewalk. I got two feet of snow in my f**king front yard! I want
> Jimmy fired! I want to see somebody fired down there! I want you
> to f**king fire some goddamn plow drivers! You come and look in
> front of my goddamn house! I am f**king just mad as hell! I want
> a plow driver fired for this and I want Jimmy's f**king head on a

2

goddamn stick!  I'm gonna start shooting these bastards if they keep this up!  I will kill every f\*\*king plow driver in this mother f\*\*king goddamn city if they do this one more f\*\*king time!  Thank you!

Jodoin testified that the defendant's message "started out pretty calm, reasonable, and then it just went from like zero to 60 and accelerated within like three seconds.  It was loud, yelling, screaming, threatening, wanted somebody fired, and then the threats came in."

After listening to the message, Jodoin contacted the police because "[a]ny time anybody . . . threatens another individual, that . . . becomes a police issue," and because he was concerned about the safety of town employees.  He also contacted the DPW and advised the director's secretary to contact the police if any DPW employees had any communication with the defendant.  In response, the police chief made a recording of the message and took it to the police station where he played it for Detective Foster and another police officer.  Given "the nature of the threat" and its "immediacy," the police went to the defendant's house.  The defendant acknowledged leaving "a pretty nasty voicemail for the Town Administrator" and stated that he "thought it was a mistake."  The officers then arrested him at approximately 11:45 a.m.

The defendant was subsequently indicted on one class B felony count of improper influence.  See RSA 640:3, I(a).  The indictment alleged that the defendant,

> with a purpose to influence a public servant's action, decision, opinion, recommendation or other exercise of discretion did threaten any harm to a public servant, . . . by calling the . . . Town Administrator leaving a message that he was going to shoot the [DPW's] snow removal employees if they plowed snow on the sidewalk in front of his home.

Following a one-day jury trial, the defendant was convicted as charged.  The trial court sentenced the defendant to a term of twelve months in the Merrimack County House of Corrections, with all but seven days suspended.

II

On appeal, the defendant first argues that the State introduced insufficient evidence to convict him of improper influence.  In order to prevail on a challenge to the sufficiency of the evidence, a defendant must demonstrate that no rational trier of fact, evaluating all of the evidence and reasonable inferences therefrom in the light most favorable to the State, would conclude beyond a reasonable doubt that he had committed the charged crime.  State v. Morrill, 169 N.H. 709, 718 (2017).  "When the evidence is solely circumstantial,

3

it must exclude all reasonable conclusions except guilt." Id. "Under this standard, however, we still consider the evidence in the light most favorable to the State and examine each evidentiary item in context, not in isolation." Id. (quotation omitted).

RSA 640:3 provides in part that "[a] person is guilty of a class B felony if he . . . [t]hreatens any harm to a public servant . . . with the purpose of influencing his action, decision, opinion, recommendation, . . . or other exercise of discretion." RSA 640:3, I(a). "Harm" is defined as "any disadvantage or injury, to person or property or pecuniary interest, including disadvantage or injury to any other person or entity in whose welfare the public servant . . . is interested." RSA 640:3, II. The jury was instructed that the crime of improper influence has three elements that the State must prove beyond a reasonable doubt: (1) the defendant made a threat of harm to another; (2) the other person was a public servant; and (3) the threat of harm was intended to influence the recipient's action, decision, opinion, recommendation, or other exercise of discretion.

The defendant contends that the plain meaning of the term "threaten" "incorporates the idea that the speaker indicates consequences that are 'impending,'" and that "[e]vidence of a threat to injure a person on some indefinite future occasion, and then only after the occurrence of a pre-condition, does not prove imminence." He also argues that "[i]nsofar as the verb 'threatens' implies a purpose to terrorize," because of the conditional nature of the defendant's statement, "combined with the fact that, as Jodoin understood, [the defendant] was in the moment overcome with anger," the defendant's purpose was "not to cause 'extreme fear,' but rather to use strong words to convey his frustration."

The interpretation of a statute is a question of law, which we review de novo. State v. Lantagne, 165 N.H. 774, 777 (2013). In matters of statutory interpretation, we are the final arbiters of the intent of the legislature as expressed in the words of the statute considered as a whole. Id. When examining the language of the statute, we construe that language according to its plain and ordinary meaning. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. We construe provisions of the Criminal Code "according to the fair import of their terms and to promote justice." RSA 625:3 (2016).

"The plain meaning of 'threaten' is 'to utter threats against: promise punishment, reprisal, or other distress . . . to promise as a threat: hold out by way of menace or warning . . . to give signs of the approach of (something evil or unpleasant): indicate as impending.'" Lantagne, 165 N.H. at 777-78 (quoting Webster's Third New International Dictionary 2382 (unabridged ed.

4

2002)).  This definition does not support the defendant's position that the threatened action must be "imminent."

Nor does the language of the statute preclude threats that are based upon the occurrence of a future event.  We agree with the State that "the plain language of the statute makes it clear that it encompasses threats to harm a public servant . . . in the future, and then only if the public servant fails to engage in the desired conduct.  In other words, it encompasses conditional threats of future harm."  See Schmitz v. U.S. Steel Corp., 831 N.W.2d 656, 667 (Minn. Ct. App. 2013) (explaining that "the primary purpose of threatening someone is to influence that individual's behavior"); Ex parte Perry, 483 S.W.3d 884, 905 (Tex. Crim. App. 2016) (noting that the term "threat" can be defined as "[a] declaration of an intention or determination to inflict . . . injury . . . conditionally upon[ ] some action or course" (quotation omitted)); Keyes v. Com., 572 S.E.2d 512, 516 (Va. Ct. App. 2002) (stating that a threat is "an avowed present determination or intent to injure presently or in the future" (quotation omitted)); State v. Edwards, 924 P.2d 397, 400 (Wash. Ct. App. 1996) (noting that "[t]he ordinary meaning of 'threaten' clearly includes . . . future threats").

We likewise reject the defendant's argument that the use of the term "threaten" in the statute "implies a purpose to terrorize."  In support, the defendant cites State v. Fuller, 147 N.H. 210 (2001).  Fuller, however, is distinguishable because it interprets the criminal threatening statute, which specifically provides that an individual is guilty when he or she "threatens to commit any crime against the person of another with a purpose to terrorize any person."  RSA 631:4, I(d) (2016); see Fuller, 147 N.H. at 212.  By contrast, under the improper influence statute, an individual is guilty when he or she threatens harm to a public servant with the purpose of influencing that person's "action, decision, opinion, recommendation, . . . or other exercise of discretion."  RSA 640:3, I(a).  Thus, our holding in Fuller that "in order for a jury to conclude that a defendant had a purpose to terrorize, the jury must conclude that the defendant had a purpose to cause extreme fear," is limited to the particular language used in that statute.  Fuller, 147 N.H. at 213.  Had the legislature intended the improper influence statute to require a purpose to terrorize, it would have said so.

The defendant further contends that "the State cannot convict [him] if his words enjoy constitutional protection under the First Amendment [to the United States Constitution] or under the free speech clause of Part I, Article 22 of the New Hampshire Constitution."  The defendant, however, failed to raise his state constitutional argument in the trial court and thus it is not preserved for our review.  See State v. Dellorfano, 128 N.H. 628, 632-33 (1986).  Accordingly, we need only address whether the defendant's conviction violates the Federal Constitution.  See State v. Wood, 128 N.H. 739, 741 (1986).

5

The improper influence statute defines "harm" to exclude "the exercise of any conduct protected under the First Amendment to the United States Constitution or any provision of the federal or state constitutions." RSA 640:3, II. The defendant acknowledges that, in certain circumstances, "the First Amendment is not violated when acts of speech are criminalized" and that "states may, without violating the [Federal] Constitution, criminalize 'true threats.'" See Virginia v. Black, 538 U.S. 343, 358-59 (2003) (plurality opinion) (explaining that "[t]he First Amendment permits restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality" (quotations omitted)); see also R.A.V. v. St. Paul, 505 U.S. 377, 388 (1992) (recognizing that "threats of violence are outside the First Amendment"); Watts v. United States, 394 U.S. 705, 708 (1969) (per curiam) (distinguishing political hyperbole from true threat).

The defendant, relying on Black, defines a "true threat" as a "statement[ ] where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359. The defendant argues that the State failed to prove that he "meant to communicate a serious expression of such intent." The State questions whether Black requires proof of the defendant's subjective intent for the speech to constitute a "true threat" and, thus, to fall outside of First Amendment protection. Cf. Elonis v. United States, 135 S. Ct. 2001, 2027 (2015) (Thomas, J., dissenting) ("The Court's fractured opinion in Black . . . says little about whether an intent-to-threaten requirement is constitutionally mandated . . . ."). As the State correctly notes, federal courts are split on this issue. See, e.g., United States v. Heineman, 767 F.3d 970, 979-82 (10th Cir. 2014) (discussing circuit split).

In United States v. Stewart, 420 F.3d 1007 (9th Cir. 2005), the Ninth Circuit acknowledged the disagreement, even within its own precedent, regarding whether "true threats" constitutionally require proof of the defendant's subjective intent. See Stewart, 420 F.3d at 1016-18. The Ninth Circuit recognized that Black contributed to, rather than resolved, this disagreement. See id. The Stewart Court ultimately assumed, without deciding, that the First Amendment requires "proof that the speaker subjectively intended the speech as a threat" because the statute at issue in that case "contain[ed] a specific intent element." Id. at 1017-18 (citing United States v. Cassel, 408 F.3d 622, 633 (9th Cir. 2005)). The statute, 18 U.S.C. § 115(a)(1)(B) (2012), "punishe[d] only threats made regarding enumerated officials with the intent to impede, intimidate, interfere with, or retaliate against such officials on account of the officials' performance of official duties." Id. at 1017. Therefore, to obtain a conviction under this statute, the government had to prove, as an element of the crime, "that the speaker intended the speech to impede, intimidate, interfere with, or retaliate against the protected official."

Id. The Ninth Circuit recognized that proof of this element "subsume[s]" the subjective intent requirement that the court assumed the First Amendment imposed, id. at 1017, 1019, given that "one cannot have the intent required under section 115(a)(1)(B) without also intending to make the threat," id. at 1017. Accordingly, because "there was sufficient evidence presented to the jury to establish the existence of such specific intent," the evidence was also "sufficient to show [that] Stewart subjectively intended the speech as a threat," thus bringing it outside the scope of First Amendment protection. Id. at 1019 (quotation omitted).

Because this case also involves a statute that contains a specific intent element, we find the Stewart case instructive. Like the Ninth Circuit, we assume, without deciding, that the First Amendment requires proof that the speaker subjectively intended his words to be understood by the recipient as a threat. See Cassel, 408 F.3d at 628, 633; Stewart, 420 F.3d at 1017-19. Here, the defendant was convicted under the improper influence statute, which contains a specific intent element: it punishes only threats of "harm to a public servant . . . [made] with the purpose of influencing his action, decision, opinion, recommendation, . . . or other exercise of discretion." RSA 640:3, I(a) (emphasis added). To convict the defendant of improper influence, the jury had to find, beyond a reasonable doubt, that the defendant left the voicemail threatening to shoot the DPW's snow removal employees with the purpose of influencing town officials in their implementation of the snow removal policy. Notably, the jury did not need to find, for statutory or First Amendment purposes, that the defendant intended to carry out the threat. See Cassel, 408 F.3d at 627-28.

Here, the defendant called the town administrator after the DPW plowed snow up to his sidewalk. The defendant yelled that he would "start shooting these [plow drivers] if they keep this up!" We conclude that the evidence, viewed in the light most favorable to the State, was sufficient to establish the specific intent element of improper influence — that the defendant conveyed threats of violence with the intent of influencing the town administrator's implementation of the town's snow plowing procedures. See Stewart, 420 F.3d at 1017, 1019. Consequently, the evidence was also sufficient to establish that the defendant subjectively intended his words to be understood by the recipient as a threat. See id. at 1019; Cassel, 408 F.3d at 628. Because his speech meets the definition of a "true threat," it falls outside the protection of the First Amendment, and his conviction for improper influence does not violate the Federal Constitution.

Finally, the defendant argues that the trial court committed plain error in failing to sua sponte strike part of Detective Foster's testimony. Foster was asked at trial what he did after listening to the voicemail message that the defendant left for Jodoin. Foster answered:

7

Well, the voicemail was somewhat threatening towards the Town Administrator and the plow truck operators for the town, and based off what was said in it, we believe that it constituted basically an obstacle or a threat that was designed to prevent the plow truck drivers from completing their duties, and based off the nature of the threat and the immediacy of it, we went to Mr. Hanes['] residence . . . .

The defendant argues that "Foster's opinion about [the defendant's] message had no tendency to prove any material or disputed fact," and "was unfairly prejudicial . . . because it communicated Foster's opinion that [the defendant's] words constituted an immediate threat, and thus proved his guilt of the charged crime." (Quotation and brackets omitted.)

Because the defendant did not object to this testimony at trial, he asks that we consider his argument under our plain error rule. See Sup. Ct. R. 16-A. The plain error rule allows us to exercise our discretion to correct errors not raised before the trial court. State v. Euliano, 161 N.H. 601, 605 (2011). "For us to find plain error: (1) there must be error; (2) the error must be plain; and (3) the error must affect substantial rights." State v. Thomas, 168 N.H. 589, 604 (2016) (quotation omitted). "If all three of these conditions are met, we may then exercise our discretion to correct a forfeited error only if the error meets a fourth criterion: the error must seriously affect the fairness, integrity or public reputation of judicial proceedings." Id. (quotation omitted). "The plain error rule is used sparingly, however, and is limited to those circumstances in which a miscarriage of justice would otherwise result." Id. (quotation omitted).

We conclude that "[e]ven if the failure to strike the testimony was somehow 'error,' that error was not plain." State v. Rawnsley, 167 N.H. 8, 12 (2014).

Plain is synonymous with clear or, equivalently, obvious. At a minimum, a court of appeals cannot correct an error unless the error is clear under current law. Thus, an error is plain if it was or should have been obvious in the sense that governing law was clearly settled to the contrary. Generally, when the law is not clear at the time of trial, and remains unsettled at the time of appeal, a decision by the trial court cannot be plain error.

State v. Lopez, 156 N.H. 416, 424 (2007) (quotations, citations, and ellipses omitted). "We have never held that a trial court must sua sponte strike or issue a curative instruction with respect to witness testimony" and, in fact, "we have suggested that courts should refrain from taking such action." State v. Noucas, 165 N.H. 146, 161 (2013); see State v. Drown, 170 N.H. ___, ___ (decided June 5, 2018) (slip op. at 10-11). Further, although we have noted

that a trial court might have an obligation to <u>sua</u> <u>sponte</u> strike testimony "when there could be no dispute that certain testimony impaired the defendant's substantial rights and adversely affected the fairness, integrity, or public reputation of judicial proceedings," the defendant has failed to demonstrate that this case presents such a circumstance. <u>Thomas</u>, 168 N.H. at 604 (quotation omitted). Accordingly, we conclude that the defendant has failed to demonstrate that the trial court committed plain error.

<u>Affirmed</u>.

LYNN, C.J., and HICKS and BASSETT, JJ., concurred.